## UTAH *v.* UNITED STATES.

No. 31, Orig. Decided March 3, 1969.

*Vernon B. Romney,* Attorney General of Utah, *Robert B. Hansen,* Deputy Attorney General, and *Dallin W. Jensen,* Assistant Attorney General, for plaintiff.

*Solicitor General Griswold, Assistant Attorney General Martz, Louis F. Claiborne, David R. Warner,* and *Martin Green* for the United States.

*L. M. McBride, Frank A. Wollaeger, Myer Feldman,* and *Martin Jacobs* for Morton International, Inc.

*George E. Boss, Raymond T. Senior, Claron C. Spencer,* and *Robert D. Larsen* for Great Salt Lake Minerals & Chemicals Corp.

PER CURIAM.

We are called upon to deal with exceptions filed by Morton International, Inc., which protests the decision by our Special Master, Senior Circuit Judge J. Cullen Ganey, denying it leave to intervene as a party defendant in this original action. While we affirm the Master's decision, we do so for reasons which are somewhat different from those advanced in the Master's Report. Consequently, it will be necessary to describe the nature

of the underlying controversy before the basis for our disposition of this matter will become clear.

This case arises out of a long-standing dispute between the United States and Utah over the ownership of the Great Salt Lake. The importance and difficulty of the controversy is magnified by the fact that, over the course of years, the lake has proceeded to shrink in size, laying bare some 600,000 acres of land which had formerly been a part of the lakebed (the so-called "relicted" lands). In 1966, Congress moved to resolve the controversy by passing a special Act, 80 Stat. 192, as amended, 80 Stat. 349, which both authorized the Secretary of the Interior to issue a quitclaim deed to the State for the entire federal interest in the lake properties and provided a mechanism by which the fair value of the federal interest could be ascertained. In consideration of the Secretary's deed, Utah was obliged either to pay the Federal Government an amount fixed by the Secretary or bring a lawsuit in this Court so that the extent of the federal claim could be judicially determined.

Utah and the United States, however, are not alone in advancing claims to the still submerged and now-relicted portions of the lake. Morton also claims part of the property, and seeks to intervene to quiet its title. Our Special Master's Report carefully sets out the nature of the competing claims of the two sovereigns and the private landlord:

"1. The State of Utah claims that on January 4, 1896, the date it was admitted to the Union, the Great Salt Lake was a navigable body of water. On the basis of this fact and the 'equal footing doctrine,' it asserts that it is the owner of the Lake's bed as delineated and determined by the official surveyed meander line and that the land (some 600,000 acres) left exposed by the recession of the Lake between

the water's edge and the meander line, known as 'public domain reliction,' is part of that bed. . . .

"2. The United States claims, excluding those exposed lands lakeward from the upland[1] transferred to patentees, title to a substantial portion (some 325,574 acres) of the exposed lands (known as 'public domain reliction' lands) claimed by Utah as part of the Lake's bed. The basis for this claim is that it was the original owner of the uplands and for that reason it is entitled to the exposed lands under the common-law doctrine of reliction.[2]

"3. Private vendees or patentees of the Lake's uplands whose interest can be traced to the United States claim all the land lakeward fronting such uplands. Their claims do not stop at the water's edge but continue to the thread of the Lake. They contend that the patents impliedly passed title to the relicted land to the owner of the adjoining uplands. The combined area of the exposed land claimed by this group amounts to approximately 275,000 acres. Morton is a good example of one of this group.

"4. In addition, however, the United States also claims the relicted land fronting the uplands of some of the patentees (or those claiming through them) under the so-called Basart doctrine. The total area claimed under this doctrine is approximately 108,780 acres, and is referred to as 'public land reliction under Basart.' These private owners

---

[1] Uplands are lots above and adjacent to the meander line. (This is Master Ganey's footnote. The Master's other footnotes have been omitted.)

[2] The United States also advances a claim, not here detailed by the Master, to certain portions of the still submerged lands as well as the brines and minerals in the lake.

[including Morton], of course, disagree that the Basart doctrine is applicable to these lands." Master's Report 6–8.

The Special Master found that the claim raised by Morton and the claims raised in the "main action have a question of law or fact in common" and that, consequently, "a district judge would exercise his discretion and permit [Morton] to intervene in the action." Report 39. The Special Master, however, refused to take this step only because he found that the State of Utah had not waived its sovereign immunity as to Morton's suit.

Upon careful consideration, we do not find it necessary to reach the ground adopted in the Report. For we have concluded that a Stipulation entered into between the United States and Utah, which was presented to the Master, has so limited the issues before this Court that the presence of Morton and similar property owners is neither necessary nor appropriate. Hence, in the exercise of our discretion, we find that the interests of justice and sound judicial administration will best be served if Morton's motion is denied.

The entry of the Stipulation significantly changes the nature of the problem before us. If the Stipulation had never been filed, it is clear that Utah could have attempted to defeat the federal claim to the *Basart* lands by proving that private landlords like Morton had the best title to them. In such a situation, Morton's right to intervene would have had a substantial basis. For if Utah sought to invoke Morton's title to avoid payment to the United States, it would seem fairest to permit Morton to speak for itself. The Stipulation makes it clear, however, that Utah will not attempt to defeat the United States' claim to the *Basart* lands by proving that the private landowners have the best title to this acreage. In other words, if Utah does not prove that *it* owns the

lake properties, it has agreed to pay the United States regardless of the other clouds on the federal claim.

On its side, the United States has also taken steps to remove the *Basart* question from this lawsuit by means of the Stipulation. It has agreed that it will not demand payment for its *Basart* claims, if the Court finds that its claims to the other disputed acreage have no merit. Consequently, it will be unnecessary to consider whether the United States or the private landowners have title to the *Basart* lands in order to determine whether the State must pay fair value to the United States in consideration for the Secretary's quitclaim deed. Thus, if the Stipulation is valid, the substantial need for Morton's presence no longer exists.

Morton, however, attacks the validity of the Stipulation agreed upon by the two sovereigns.[3] While it does not deny that the parties to an ordinary lawsuit may limit the issues they will tender to the Court for decision, Morton points out that this is no ordinary lawsuit, but one whose nature is defined by the special Act of Congress, *supra,* in which the United States waived its immunity in this litigation. Morton argues that the Stipulation has transformed the suit in a way that is contrary to Congress' intention, and that consequently this Court should not accept the parties' attempt to narrow the issues.

We cannot, however, accept the premise upon which Morton's argument is based. We find that the Stipulation does not transform the action in a way which Congress would have disapproved. The structure of the

---

[3] While in the original Stipulation, the two sovereigns sought to defer decision as to which of them owned the still submerged lands under the lake, as well as the lake's brines and minerals, the Special Master ruled that the United States must contest the State's claims to these resources in the present action. Neither the State nor the Federal Government has contested this aspect of the Master's ruling.

relevant Act indicates decisively that Congress did not anticipate that this action would necessarily lead to an adjudication of the private parties' claims to the *Basart* lands. Section 5 of the Act gave Utah the right to pay over an amount of money determined by the Secretary of the Interior after the Secretary had given "consideration to all factors he deems pertinent to an equitable resolution of the question of the proper consideration to be paid by the State of Utah . . . ." If the State had taken this option, the private landowners would never of course have had an opportunity to invoke the original jurisdiction of this Court since Utah would never have filed its complaint. Consequently, it is difficult to believe that the will of Congress will be frustrated if the issues tendered to this Court by the sovereigns are structured so that we may resolve their dispute without considering the additional claims advanced by the private parties.[4]

Similarly, we do not find any merit in Morton's challenge to that part of the Stipulation in which the United States has promised not to demand payment for its *Basart* claims, if its other claims are not vindicated. Morton argues that the Solicitor General is without authority to give away potentially valuable property when Congress has expressly required that the Nation receive fair value. But this argument ignores the fact that the Solicitor General has indicated in his brief that he believes he can advance no colorable argument which could conceivably vindicate the Federal Government's *Basart* interest if the Government's right to the other disputed

---

[4] Indeed, § 2 of the Act contains a proviso which declares that "the provisions of this Act shall *not* affect (1) any valid existing rights or interests, if any, of any person, partnership, association, corporation, or other nongovernmental entity, in or to any of the lands within and below said meander line . . . ." (Emphasis supplied.) This language suggests that Congress expected that the interests of the private parties would not be adjudicated here.

property is not upheld. This being so, the Solicitor General, acting under his broad authority to conduct the Federal Government's litigation in this Court, 28 U. S. C. § 518 (1964 ed., Supp. III), was surely entitled to remove the issue from the case.

Finally, Morton claims that under Rule 19 (a) of the Federal Rules of Civil Procedure it should be permitted to intervene because its absence will "leave [one] of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest." Morton contends that Utah may be obliged to pay the United States for the *Basart* claims in this present action, only to have another Court later find that the private landowners in fact have the best title, requiring Utah to pay again if it wishes to control the *Basart* lands. But Utah has never favored Morton's motion to intervene, despite the fact that the company's absence here may mean that the State may ultimately be obliged to pay for the lands a second time. Indeed, Utah has consistently opposed Morton's motion. Since the Federal Rules are a guide to the conduct of original actions in this Court only "where their application is appropriate," Rule 9 (2) of the Rules of Court, and since our original jurisdiction should be invoked sparingly, we hold that the State of Utah may properly waive the protection of Rule 19 here.[5]

While we can perceive no compelling reason requiring the presence of Morton in this lawsuit, there are substantial reasons for denying intervention. If Morton is admitted, fairness would require the admission of any of the other 120 private landowners who wish to quiet their title to portions of the relicted lands, greatly in-

---

[5] Thus, we need not determine the conditions under which Rule 19 (a) may properly be waived by the party it protects in an ordinary litigation in the district courts.

creasing the complexity of this litigation. Moreover, if any private landlord who is a citizen of Utah should seek to intervene, we would be required to decide the difficult constitutional question as to whether this Court may retain its original jurisdiction over an action in which complete diversity of citizenship no longer exists between the contesting parties.

With the issues limited by the Stipulation, we find, as did the Special Master, that the Solicitor General may be relied upon to represent the limited interests of the private landlords in this case. While Morton doubtless wishes to have us settle its additional claims, we decline to permit intervention for the sole purpose of permitting a private party to introduce new issues which have not been raised by the sovereigns directly concerned. We are thus constrained to require the company to seek another forum which may, with greater efficiency, hear and decide its claims, together with any defenses the sovereign concerned wishes to interpose.

We also agree with the Special Master that "it is equitable and in good conscience to proceed to adjudicate the controversy between the State of Utah and the United States" in Morton's absence, Report 47, and we hereby authorize him to proceed to the merits.

The Report of the Special Master will be placed on file and his determination denying intervention to Morton International, Inc., is approved.[6]    *It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

---

[6] Before the United States and Utah entered their Stipulation, the Great Salt Lake Minerals & Chemical Corp. sought to intervene in this action. While the Master denied this motion as well as Morton's, M&C has chosen to acquiesce in the Master's decision so long as the Stipulation is approved. Thus, no further action on this motion is required in the light of our disposition here.