Carolyn AIELLO, Individually and on behalf of all others similarly situated, Plaintiff,

v.

Sigurd HANSEN, as Director of the State Department of Human Resources Development, Defendant.

Augustina D. ARMENDARIZ et al., Petitioners,

v.

Sigurd HANSEN, as Director of the State Department of Human Resources Development, Respondent.

Nos. C–72–1402 SW, C–72–1547 SW.

United States District Court, N. D. California.

May 31, 1973.

Joanne Condas, Deputy Atty. Gen., San Francisco, Cal., for Sigurd Hansen.

Jack Levine, Levy & Van Bourg, Los Angeles, Cal., for petitioners-intervenors.

Joel Gomberg, Peter H. Weiner, California Rural Legal Assistance, Gilroy, Cal., Wendy Webster Williams, Legal Aid Society of San Mateo County, Redwood City, Cal., for plaintiffs.

Cecilia D. Lannon, Legal Aid Society of Marin County, San Rafael, Cal., for petitioners Armendariz, Johnson and Jaramillo.

Roland C. Davis, Davis, Cowell & Bowe, San Francisco, Cal., for San Francisco Waitresses Union.

Joseph C. Morehead, Wong, Siedman & Lee, San Francisco, Cal., for plaintiff Carolyn Aiello.

Nancy E. Stanley, Equal Employment Opportunity Commission, Washington, D. C., amici curiae.

Before DUNIWAY, Circuit Judge, and WILLIAMS and ZIRPOLI, District Judges.

## OPINION

ZIRPOLI, District Judge.

Plaintiffs, on behalf of themselves and other women similarly situated, challenge the provision of California Unemployment Insurance Code § 2626 which exempts pregnancy-related work loss from the coverage of the state disability insurance program until 28 days after the termination of pregnancy.[1]  Each

---

1. California Unemployment Insurance Code § 2626:

   "Disability" or "disabled" includes both mental or physical illness and mental or physical injury.  An individual shall be deemed disabled in any day in which, because of his physical or mental condition, he is unable to perform his regular or customary work. In no case shall the term "disability" or "disabled" include any injury or illness caused by or arising in connection with pregnancy up to the termination of such pregnancy and for a period of 28 days thereafter.

suffered a pregnancy-related disability and solely because of § 2626, each was denied benefits. This treatment, plaintiffs argue, unconstitutionally discriminates against pregnant women. They ask that the court declare this portion of the statute invalid, enjoin the State Department of Human Resources Development from denying benefits on the basis of this provision, and require that the Department consider plaintiffs' applications for benefits as if the challenged provision did not exist. Because plaintiffs seek to enjoin the enforcement of a state statute, a three-judge court was convened pursuant to 28 U.S.C. § 2281. The parties have now filed cross-motions for summary judgment,[2] each agreeing that no relevant facts are in dispute.

## I.

The California Unemployment Insurance Code establishes a comprehensive legislative scheme designed to provide protection against wage loss caused by involuntary unemployment. The disability insurance program, which is involved in this suit, provides benefits to persons unable to perform their customary work because of nearly any physical or mental condition; a complementary program provides compensation to unemployed persons able to and available for work. Thus, the state has attempted to reduce to a minimum the suffering caused by involuntary unemployment of every type. Calif.Unemp.Ins.Code §§ 100, 2601.

The disability insurance program is wholly supported by employee contributions. At present, employees must contribute one percent of their salary up to a maximum of $85 per year. *Id.* §§ 984, 985, 2901. In order to be eligible to receive benefits, previous to the time of his disability an employee must have contributed one percent of a minimum income of $300 during a one year base

period. *Id.* § 2652. Having satisfied this requirement, an employee is eligible to receive "basic benefits" varying between $25 and $105 per week, depending upon the amount earned during the base period, for a maximum of twenty-six weeks.[3] *Id.* §§ 2653, 2655. These benefits begin on the eighth day of disability, or, if the person is hospitalized, on the first day of hospitalization. *Id.* §§ 2627(b); 2802. While hospitalized, an employee is also eligible for "additional benefits" of $12 per day for a maximum of twenty days. *Id.* § 2801. The fund is protected against false claims by the requirement that claims be accompanied by the affidavits of a licensed medical practitioner attesting to the existence of a disability and by the requirement that an employee must submit to such reasonable examinations as the Department may require. *Id.* §§ 2627(c), (d) 2708, 2710.

In conformity with the aim of reducing the suffering of those unable to work regardless of the reason, the disability insurance program provides benefits on account of nearly any incapacity. Those confined in an institution as a dipsomaniac, drug addict, or sexual psychopath are disqualified from receiving benefits while they are confined. *Id.* §. 2678. The program compensates all others who are incapacitated with the *sole* exception that women, during a pregnancy and for 28 days after its termination, are denied benefits for any incapacity resulting from the pregnancy itself or any illness or injury caused by or arising in connection with the pregnancy. *Id.* § 2626. It is this special treatment that plaintiffs claim denies them the equal protection of the laws.

## II.

Plaintiff Aiello, a self-supporting woman, was forced to cease working as

---

2. Defendant denominated his motion a motion to dismiss, but because it is accompanied by affidavits which the court considers, the courts treats it as a motion for summary judgment. Fed.R.Civ.P. 12(b).

3. This amount, however, cannot exceed one-half of the total wages paid to the individual during his base period. Calif. Unemp.Ins.Code § 2653.

a hairdresser on June 21, 1972, because of medical problems arising in connection with her pregnancy. The next day she was hospitalized, and after it was discovered that she was suffering from ectopic pregnancy, surgery was performed to terminate her pregnancy. Ms. Aiello's doctor ordered that she not return to work until July 28, 1972. On June 23 she applied for disability insurance benefits. These benefits were denied for the sole reason that her disability arose in connection with her pregnancy.

Plaintiff Armendariz is the sole source of support for herself, her husband, and an infant son. She was forced to cease working as a secretary on May 8, 1972, when she became ill and began bleeding. Early the next day she called an ambulance; on the way to the hospital she went into labor and suffered a miscarriage. Pursuant to the orders of her doctor, Ms. Armendariz did not return to work until the end of May. She applied for disability insurance benefits, and her application was denied solely because her disability arose in connection with pregnancy.

Plaintiff Johnson is the head of a household composed of herself and her five-year-old son. Their main source of support is the income she receives as an operator for the telephone company. Ms. Johnson entered the hospital on May 22, 1972, after experiencing intense abdominal pain, swelling in the legs, back pain, and general illness. Her condition was diagnosed as tubal pregnancy and, in order to save her life, an operation was performed to terminate the pregnancy. She was discharged from the hospital on May 30 and advised not to return to work until July 10. Her disability insurance claim was denied for the reason that her disability was disqualified by § 2626's pregnancy exclusion.

The last individual plaintiff, Ms. Jaramillo, was eight months pregnant when the initial petition for writ of mandate was filed. The court has been advised that she since had a normal delivery of her child. Except for her husband's educational expenses, her income is the sole source of support for herself, her husband, and their baby. Ms. Jaramillo wishes to receive benefits for the period during which she was physically incapacitated by the delivery of her child.

This case initially arose as two separate lawsuits. Ms. Aiello presented her claim in a federal court action, and the other plaintiffs initially presented their claims in a petition for a writ of mandate filed in the California Supreme Court. Defendant removed the state court action and it was subsequently consolidated with Ms. Aiello's suit. The plaintiffs who initially filed in state court moved that this court stay further proceedings pending the outcome of a state suit, but because neither the initial plaintiff nor the defendant saw any possibility that the statute could be construed so as to avoid the constitutional question, the motion was not granted. This court, therefore, must reach the federal constitutional claim presented.

### III.

The threshold issue is what standard of review should be applied to test the validity of laws, such as § 2626, which discriminate on the basis of a sex-linked characteristic. In recent years the Supreme Court has employed two equal protection tests: If a statute is based upon a "suspect" classification, e. g., Graham v. Richardson, 403 U.S. 365, 372, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), or it concerns a "fundamental" interest, e. g., Shapiro v. Thompson, 394 U.S. 618, 627, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), it is subject to "strict scrutiny" and will be held invalid in the absence of a countervailing "compelling" state interest. In all other instances, a statutory classification is valid unless it is without "rational basis." E.g., Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). See generally Shapiro v. Thompson, supra at 658–662, 89 S.Ct. 1322 (Harlan, J., dissenting); Developments in the Law:

Equal Protection, 82 Harv.L.Rev. 1065, 1076–1131 (1969) [hereinafter cited as *Developments*].

■ Although the Supreme Court has considered the question in two recent cases, Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), and Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), it remains unclear how sex discrimination fits within equal protection doctrine. Although four members of the *Frontiero* Court were willing to hold that sex is a "suspect" classification, the majority refused to put sex in this category, at least until a case is presented that requires consideration of this extension of *Reed*. In view of the Supreme Court's intentional restraint, this court similarly does not consider whether sex discrimination is "suspect," because the challenged statute is invalid even under the *Reed* test. *See also* Eisenstadt v. Baird, 405 U.S. 438, 447 n.7, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

■ Plaintiffs argue that, even under the test stated in the opinion in *Reed*, it is unclear how classifications based upon sex should be treated by the courts. Clearly the *Reed* Court did not apply the "strict scrutiny" test. The Court, however, did hold invalid the statute challenged in *Reed*, whereas, until the last term, when the Court employed the "rational basis" test it almost always upheld the statute that was being scrutinized. *See generally* Gunther, The Supreme Court, 1971 Term—Forward: In Search of Evolving Doctrine on a Changing Court, 86 Harv.L.Rev. 1, 8 (1972); *Developments, supra* at 1087. Also, the opinion uses language quite different from language employed in some former "rational basis" opinions. *Compare* Reed v. Reed, *supra* at 75–76 of 404 U.S., 92 S.Ct. 251 *with, e. g.,* Dandridge v. Williams, *supra* at 485, 397 U.S., 90 S.Ct. 1153. Finally, *Reed* rejects that idea that a challenged state statute can be justified on the basis of sexual stereotypes: Whereas the state supreme court found that avoiding hear-

ings by having an automatic preference for men administrators is "neither . . . illogical nor arbitrary," because men generally have more experience in business matters, 93 Idaho 511, 514, 465 P.2d 635, 638 (1971), the Supreme Court deemed this "the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause." 404 U.S. at 76, 92 S.Ct. at 254. In this way, *Reed* greatly differs from some prior sex discrimination cases. *See* Hoyt v. Florida, 368 U.S. 57, 61–62, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961); Muller v. Oregon, 208 U.S. 412, 421–422, 28 S.Ct. 324, 52 L.Ed. 551 (1908).

Because of these differences between *Reed* and prior "rational basis" test cases, it is not unreasonable to argue, as plaintiffs do, that *Reed* adopted an "intermediate test" for discrimination based upon sex. *See* Eslinger v. Thomas, 476 F.2d 225 (4th Cir. 1972); Wark v. Robbins, 458 F.2d 1295, 1297 n. 4 (1st Cir. 1972) (dictum). It appears more likely, however, that *Reed* is not intended to establish a special equal protection test for sex discrimination. In Police Dep't v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), the Court cites *Reed* as a case stating the test applicable to "all equal protection cases." Similarly, in Eisenstadt v. Baird, *supra* at 446–447 of 405 U.S., at 1035 of 92 S. Ct., the Court summarizes "[t]he basic principles governing application of the Equal Protection Clause" by quoting *Reed*'s statement of the "rational basis" test.

■ These, and other, recent Supreme Court opinions show that *Reed* is probably only one of several cases that mark a general shift in the "rational basis" test to a standard "slightly, but perceptibly, more rigorous." Green v. Waterford Bd. of Educ., 473 F.2d 629 at 633 (2d Cir. 1973); *see Gunther, supra* at 18–37. Under this test, courts must truly "scrutinize" challenged legislation and see whether the classifications made are "reasonable, not arbitrary, and . . . rest upon some ground of dif-

ference having a fair and substantial relation to the object of the legislation." Reed v. Reed, *supra* at 76 of 404 U.S., at 254 of 92 S.Ct.; *see* Eisenstadt v. Baird, *supra* at 446–447 of 405 U.S., 92 S.Ct. 1029.[4] The differences in application that have resulted from the use of this test are difficult to particularize. But, as Professor Gunther notes:

> Judicial deference to a broad range of conceivable legislative purposes and to imaginable facts that might justify classifications is strikingly diminished. Judicial tolerance of overinclusive and underinclusive classifications is notably reduced. Legislative leeway for unexplained pragmatic experimentation is substantially narrowed.

*Gunther, supra* at 20; *see* Green v. Waterford Bd. of Educ., *supra* at 633 of 473 F.2d. Also, as discussed above, the new test, as applied in *Reed*, requires rejection of statutory classifications based upon stereotypical generalizations rather than reason. *See* Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L. Ed.2d 551 (1972); Heath v. Westerville Bd. of Educ., 345 F.Supp. 501, 506 (S. D.Ohio 1972); *cf*. 29 C.F.R. § 1604.-1(a)(1)(ii).

This slightly altered "rational basis" test is the standard the court applies in this case. The court agrees with plaintiffs' conclusion that under this test the classification contained in § 2626 must be held to be unconstitutional.

### IV.

Pregnancy is clearly a unique human condition: only pregnancy can result in the birth of a child. For a woman, however, the effects of pregnancy and pregnancy-related illness are debilitating in much the same way as the physical and mental conditions that are included within the scope of the disability insurance program. The question whether the exclusion of pregnancy-related disabilities from the program is arbitrary or rational depends upon whether pregnancy and pregnancy-related illness substantially differ from the included disabilities in some manner relevant to the purposes of the disability insurance program.

The search for the purposes that actuated the legislature is a difficult one. The only purpose expressly stated for the enactment of the disability insurance program is "to compensate in part for the wage loss sustained by individuals unemployed because of sickness or injury and to reduce to a minimum the suffering caused by unemployment resulting therefrom." Calif.Unemp.Ins.Code § 2601. Clearly the exclusion of pregnancy-related disabilities *does not* promote this purpose; the economic hardship pregnant women suffer when they cannot work is identical to the hardship of other disabled workers. Thus, the court must look to those unexpressed purposes that, according to the defendant, are promoted by excluding pregnancy-related disabilities from the program.

The principal argument the defendant has made in this court is substantially the same argument accepted in Clark v. California Employment Stabilization Comm'n, 166 Cal.App.2d 326, 331–332, 332 P.2d 716 (1958)—that the exclusion of pregnancy-related disabilities is necessary to protect the solvency of the dis-

---

4. The suggestion in Judge William's opinion that San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), establishes a more tolerant standard than that quoted from *Reed* is incorrect. In Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 172, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972), Mr. Justice Powell, the author of *Rodriguez*, states the "rational basis" test in words nearly identical to those used in *Rodriguez*. In that case the Court held invalid a state statute because fulfillment of an admittedly legitimate state purpose was "not *significantly* disturbed" by doing so. 406 U.S. at 175, 92 S.Ct. 1400 (emphasis added); *see id.* at 183–184, 92 S. Ct. 1400 (Rehnquist, J., dissenting). Thus, although Mr. Justice Powell states the "rational basis" test in different terms than those used by the Chief Justice in *Reed*, he, too, requires that a classification have a *substantial* rational relationship to a legitimate state purpose.

ability insurance program. As discussed, the program is financed entirely from employee contributions. To pay benefits for pregnancy-related disabilities, defendant argues, would be so costly that this mode of financing the program would be impracticable.

Clearly it is a legitimate interest for a state to attempt to preserve the fiscal integrity of its programs. Shapiro v. Thompson, 394 U.S. 618, 633, 89 S. Ct. 1322, 22 L.Ed.2d 600 (1969). More particularly, a state may properly seek to make a program self-sustaining and paid for by those who use it rather than by tax revenues drawn from the public at large. United States v. Kras, 409 U. S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973); James v. Strange, 407 U.S. 128, 141, 92 S.Ct. 2027, 32 L.Ed.2d 600 (1972). "But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens." Shapiro v. Thompson, *supra* at 633 of 394 U.S., at 1330 of 89 S.Ct.; *see* James v. Strange, *supra* at 141–142 of 407 U. S., 92 S.Ct. 2027; Rinaldi v. Yeager, 384 U.S. 305, 309–310, 86 S.Ct. 1497, 16 L. Ed.2d 577 (1966). Thus, the fact that excluding pregnancy-related disabilities saves costs is only a first step; the state also must show that the exclusion of pregnancy-related disabilities rests upon some ground of difference having a fair and substantial relation to the object of the legislation.

Defendant argues that pregnancy-related disabilities are unique in that coverage of these disabilities is so extraordinarily expensive that it would be impossible to maintain a program supported by employee contributions if these disabilities are included. Unfortunately, it is impossible to determine if the cost of including these disabilities is substantially greater than the cost of including other disabilities, because, according to defendant, no statistics are available indicating the cost to the program of paying benefits on account of various disabilities presently covered. Even using defendant's estimate of the cost of expanding the program to include pregnan-cy-related disabilities, however, it is clear that including these disabilities would not destroy the program. The increased costs could be accommodated quite easily by making reasonable changes in the contribution rate, the maximum benefits allowable, and the other variables affecting the solvency of the program. For example, the entire cost increase estimated by defendant could be met by requiring workers to contribute an additional amount of approximately .364 percent of their salary and increasing the maximum annual contribution to about $119.

Moreover, regardless of the effect the inclusion of pregnancy-related disabilities would have, these disabilities cannot be excluded merely because the cost of including the entire group might be prohibitive. While some women suffering pregnancy-related disabilities will have large claims, not all pregnant women will. As the court noted in Heath v. Westerville Bd. of Educ., 345 F.Supp. 501, 505 (S.D.Ohio 1972), in its discussion of an analogous problem:

> Pregnancies, like law suits, are *sui generis*. While there are certain general similarities between each pregnancy, no two are entirely identical. While it may be quite true that some women are incapacitated by pregnancy and would be well advised to adopt regimens less strenuous than those borne by school teachers, to say that this is true of all women is to define that half of our population in stereotypical terms and to deal with them artificially. Sexual stereotypes are no less invidious than racial or religious ones. Any rule by an employer that seeks to deal with all pregnant employees in an identical fashion is dehumanizing to the individual women involved and is by its very nature arbitrary and discriminatory. [Citations and footnote omitted.]

Similarly, by excluding all pregnancy-related disabilities on the grounds that these claims will be large, the state denies pregnant women benefits on the basis of generalities and stereotypes con-

trary to the requirements of the equal protection clause.

Like the forced maternity leave in *Heath,* the denial of benefits for pregnancy-related disabilities seems to have its roots in the belief that all pregnant women are incapable of work for long periods of time, and therefore, they will submit large disability claims. The truth of this belief is certainly suspect. As the *Heath* court pointed out, the treatment of pregnancy in other cultures shows that much of our society's views concerning the debilitating effects of pregnancy are more a response to cultural sex-role conditioning than a response to medical fact and necessity. 345 F. Supp. at 505 n. 1. Indeed, a realistic look at what women actually do even in our society belies the belief that they cannot generally work throughout pregnancy. *See* Struck v. Secretary of Defense, 460 F.2d 1377, 1379 (9th Cir. 1972) (Duniway, J., dissenting), vacated and remanded to consider mootness, 409 U.S. 1071, 93 S.Ct. 676, 34 L.Ed.2d 660 (1972). Nevertheless, the belief that pregnant women are disabled for substantial periods results in their being denied the opportunity to work, unemployment compensation benefits designed to aid those able to work, and—because of the belief that they will submit large claims—disability insurance benefits. *See generally* Walker, Sex Discrimination in Government Benefits Programs, 23 Hastings L.J. 277, 282–284, 285 (1971). Thus, the apparently solicitous attitude that pregnant women are in a "delicate condition" has the effect that they often cannot earn an income or obtain the usual social welfare benefits for the unemployed. The only way to assure that this irrational result is not simply the product of mistaken stereotypical beliefs is to require, as the equal protection clause does, that each pregnant woman be considered individually. *Cf.* Sail'er Inn, Inc. v. Kirby, 5 Cal.3d 1, 19–20, 95 Cal.Rptr. 329, 485 P.2d 529 (1971).

■■ Therefore, if the state wishes to prevent or limit large claims, it must do so directly by excluding or limiting all claims in excess of certain amounts, not by excluding a disability that, in the opinion of the legislature, is likely to result in large claims. Then, to the same extent a heart attack victim or one suffering from sickle cell anemia is limited in the benefits he can receive, a woman disabled by pregnancy who makes a large claim will be limited.[5] Pregnant women with smaller claims, however, would then be able to collect disability insurance benefits rather than be denied any relief on account of a stereotypical belief about women.[6]

The court, therefore, concludes that pregnancy-related disabilities cannot constitutionally be excluded solely because of the cost of adding these benefits. Defendant has failed to point to any rational ground of difference that would lead the court to conclude that it is not merely saving expense by arbitrarily denying benefits to a class of citizens. Thus, this case is like the hypothetical situation once suggested by the Supreme Court of a state reducing expenditures for education by barring indigent children from the schools. *See*

---

5. In such a nondiscriminatory system, if the contribution rate generated too much or too little income, increases or decreases in benefits would be spread across the entire work force. In the past, when excess income was generated the legislature increased the benefits to all workers except pregnant women.

6. Although plaintiffs have argued that § 2626 is the result of stereotypical beliefs, others have suggested that pregnancy-related disabilities were excluded because women are a politically weak group, and reducing budgets by denying social welfare benefits to groups of women is, therefore, politically expedient. *Walker, supra* at 285. Precluding discrimination based upon political expediency is, of course, one of the traditional functions of the equal protection clause. *See* Railroad Express Agency, Inc. v. New York, 336 U.S. 106, 112–113, 60 S.Ct. 463, 93 L.Ed. 533 (1949) (Jackson, J., concurring).

Shapiro v. Thompson, *supra* at 633 of 394 U.S., 89 S.Ct. 1322. Accordingly, the saving of cost cannot justify the classification.

Defendant also argues that other purposes actuated the legislature when it excluded pregnant women from the disability program. Although clearly the saving of costs was the main purpose, the court considers these other purposes, because they might be genuine secondary purposes. *See* McGinnis v. Royster, 410 U.S. 263, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973).

First, defendant suggests that one purpose of excluding pregnancy-related disabilities was to prevent women from receiving more than their share of benefits under the disability insurance program. This argument is based upon the fact that, at the present time, women contribute about 28 percent of the total disability insurance fund and receive back about 38 percent of the fund in benefits. Even if the state could constitutionally create a disability insurance program based upon actuarial data and tie the amount of benefits various groups would receive to the amount they contribute, the California disability insurance program is not such a program. Indeed, the program has a scale of benefits which is designed so that its likely effect will be that those earning small incomes will receive more in benefits than they contribute. *See* Calif.Unemp. Ins.Code § 2655. Thus, defendant must admit, and he candidly does admit, that it cannot be argued that in California's system "the right to benefits should have any relationship to the amount contributed to the fund." Defendant's Memorandum of Law at 12. In view of the absence of any consistent attempt to limit benefits of various groups based upon actuarial considerations, the state certainly cannot justify limiting benefits for pregnant women on this basis. To

do so discriminates between these women and members of other groups who receive benefits greater than their contributions, and it, therefore, can be upheld only if some rational difference justifies the discrimination. No such difference exists, especially as between pregnant women and other women suffering sex-related disabilities.

Next, defendant argues that pregnancy-related disabilities were excluded to prevent abuse of the disability program. Pregnancy, defendant notes, is, to a large degree, voluntary, and he suggests that this would make it possible for a woman not interested in a career to abuse the disability insurance program by working a short period, becoming pregnant, and collecting a substantial award.[7] But pregnancy-related illness and injuries, such as those suffered by plaintiffs Aiello, Armendariz, and Johnson, are not voluntary, and they, too, are excluded from coverage. Moreover, every other voluntary disability, including, for example, cosmetic plastic surgery, is included. Thus, it is difficult to believe that pregnancy-related disabilities were excluded to avoid abuse. If that was the legislature's purpose, the present scheme achieves it so irrationally that it cannot be upheld. *See* Weber v. Aetna Cas. & Sur. Co., 406 U.S. 164, 173, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972); Eisenstadt v. Baird, 405 U.S. 438, 448–452, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

Defendant's final argument is that pregnancy-related disabilities are excluded to avoid potentially difficult problems of determining when a woman is truly disabled by a pregnancy-related condition. There is some question whether a state may constitutionally discriminate against a class of persons merely to eliminate hearings on the merits of their claims. *See* Stanley v. Illinois, 405 U.S. 645, 656–657, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Reed v. Reed, *supra* at 76

---

7. Defendant suggests the following hypothetical case: A woman who is not interested in pursuing a career could work one year, earn $8,500, contribute $85 to the disability insurance fund, become pregnant, and collect $2,730 *if* a doctor certified that she was disabled by her pregnancy for 26 weeks.

of 404 U.S., 92 S.Ct. 251. But see Weber v. Aetna Cas. & Sur. Co., *supra* at 174–175 of 406 U.S., 92 S.Ct. 1400. Even if this is a permissible objective, however, it is difficult to understand the rationality of achieving it by excluding only pregnancy-related disabilities until 28 days after the termination of pregnancy. First, a condition is no more easily shown to be disabling 28 days after the termination of pregnancy than prior to that time. Second, there is no reason to believe that the general requirements—that a claim be accompanied by a doctor's certificate and that a claimant submit to examination when defendant requires—will work any less well to assure the validity of pregnant women's claims than other claims. Certainly defendant cannot successfully argue that all pregnancy-related disabling conditions manifest themselves in less objective form than included disabilities. The conditions plaintiffs suffered, for example, resulted in dramatic, objective, medically verifiable disabilities. Finally, some conditions normally included as disabilities are excluded from coverage if they occur in connection with pregnancy. Clearly these conditions are no more objectively verifiable simply because the victim is not pregnant. Thus, it is unlikely that the state excluded pregnancy benefits to obviate problems of proof; if this was the purpose, there is not a sufficient rational relationship between the means and the end.

Having found that the exclusion of pregnancy-related disabilities is not based upon a classification having a rational and substantial relationship to a legitimate state purpose, the court must hold unconstitutional the provision of § 2626 excluding these benefits. Although this may require adjustments in the details of the disability insurance program, it does not interfere with the salutory purposes of the program. Nor does it thwart the state's legitimate interest in financing the program from the contributions of those receiving benefits. Fulfillment of these goals does not require that the disability insurance program embody an element of discrimination that denies pregnant women equal treatment.

In accordance with the foregoing, which constitutes the court's findings of fact and conclusions of law,

It is hereby ordered and adjudged that:

(1) plaintiffs' motion for summary judgment is granted and defendant's motion for summary judgment is denied;

(2) the third sentence of California Unemployment Insurance Code § 2626, which provides, "In no case shall the term 'disability' or 'disabled' include any injury or illness caused by or arising in connection with pregnancy up to the termination of such pregnancy and for a period of 28 days thereafter," deprives pregnant women of the equal protection of the laws contrary to the Fourteenth Amendment, and is therefore void;

(3) defendant, his successors in office, agents, and employees are enjoined from refusing to grant disability insurance benefits on account of the third sentence of California Unemployment Insurance Code § 2626;

(4) defendant shall forthwith reconsider the applications of plaintiffs Aiello, Armendariz, Johnson, and Jaramillo for disability insurance benefits and grant them such benefits as they are entitled to receive without regard for the third sentence of California Unemployment Insurance Code § 2626;

(5) the judgment that the court enters shall be a final judgment pursuant to Rule 54(b), Federal Rules of Civil Procedure, there being no just reason for delay in entry of final judgment for these plaintiffs; and

(6) plaintiffs are directed to prepare and submit a form of judgment in accordance with the foregoing and Local Rule 123.

SPENCER WILLIAMS, District Judge:

I respectfully dissent.

## I.

Plaintiffs herein, each denied disability insurance benefits by virtue of California Unemployment Insurance Code § 2626, claim that they are the victims of unreasonable discrimination based on their sex and are thus denied equal protection of the laws guaranteed by the Fourteenth Amendment. While conceding that there are some constitutionally permissible classifications on the basis of sex, they contend that no such valid basis exists here.

Defendant argues that this is not a discrimination against womankind, but only a permissible limitation of liability as to certain women during the transitory period of their pregnancy—plus 28 days; that viewed in its entirety the California Disability Insurance program is not discriminatory against women since they are faring much better than men under it;[1] that the limitation of liability provided by § 2626 is a reasonable insurance regulation based on valid economic objectives[2] derived from sound actuarial considerations; that it bears a rational relationship to the objectives of the legislation and that the granting of plaintiffs' motion would, in the name of equality, create an even greater program imbalance in favor of women over men.[3]

## II.

As in all Equal Protection matters the court must first determine the standard to be used in assessing the validity or invalidity of the State legislation under attack. If the legislation interferes with a right explicitly or implicitly guaranteed by the Constitution or involves a suspect classification, the state must carry the heavy burden of justification by showing a compelling state interest therefor. If such a fundamental right is not involved, and if the classification is not suspect, the state is entitled to the usual presumption of validity and the individual carrying the attack has the burden of showing that it fails to rationally further any legitimate state purpose. Rodriguez v. San Antonio Independent School District, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

The majority states that while it is likely " . . . that *Reed* is not intended to establish a special equal protection test for sex discrimination", the case does represent a movement toward a new standard " . . . slightly, but perceptively, more rigorous." This leads us, the court concludes, to an equal protection analysis that rejects " . . . statutory classifications based upon sterotypical generalizations rather than reason." But I do not read pre-*Reed* cases as teaching anything less than this, and I believe that *Reed* teaches nothing more. The pivotal language of that opinion is a concise statement of the traditional test:

"The question presented by this case, then, is whether a difference in the sex of competing applicants for letters of administration *bears a rational relationship to a state objective that is sought to be advanced* by the operation of §§ 15–312 and 15–314." (Emphasis added.)

That such was and is the applicable standard is amply demonstrated in *Rodriguez, supra* wherein Justice Powell, writing for a majority of the court, states:

"A century of Supreme Court adjudication under the Equal Protection Clause affirmatively supports the application of the traditional standard

---

1. Women contribute only 28% of withholdings but draw 38% of the benefit payments. Put another way, men receive $.89 per dollar contributed while women receive $1.37 per dollar contributed.

2. Defendant estimates that providing the claimed benefits to the estimated 210,000 who would be eligible would cost $120.2 million and require a 30% increase of revenue, either by increasing the rates or raising the ceiling of income subject to disability withholding.

3. Comparison of Male and Female Occupational Groups indicate that even without maternity benefits women have a higher annual claim rate, claim duration, and claim cost than men in every age group except 60–69.

of review which requires only that the State's system be shown to bear *some rational relationship to legitimate state purpose.*" (Emphasis added.) 411 U.S. at 40, 93 S.Ct. at 1300.

Furthermore, in its most recent consideration of this question, a closely divided Supreme Court declined to hold that classifications based on sex are suspect.[4]

### III.

Viewed separately, § 2626 seems to present an almost *per se* case of invidious discrimination. This appearance quickly dissolves, however, when in applying the rational relationship test, we view § 2626 in its context as an integral part of the Disability Benefits program.

The Disability Insurance Program is one segment of a three-part comprehensive insurance program to cover workers in California, the other two segments being Workmen's Compensation Insurance and Unemployment Insurance. The Workmen's Compensation Insurance Program was first enacted in California in 1913 and provided compensation for job-related illnesses or injuries regardless of fault. Then and now the law required all "employers" (as defined by statute) to secure payment of compensation for their employees by purchasing insurance from the State Fund, approved private insurance carriers or through self insurance (Labor Code § 3700). The entire costs are borne by the employer, it being a criminal offense to shift any of the cost thereof to the employee (Labor

Code § 3751). The California Unemployment Insurance Program was adopted in 1935 and is also financed exclusively by employer contributions, no part of the cost of which is to be shifted to the employees.[5] Its purpose is to protect the purchasing power of persons becoming unemployed through no fault of their own, both for their own benefit and the benefit of the economy of the state.[6] The original act excluded payments for unemployment caused by illness or injury, and provided for a 1% *employee* contribution. By 1946, experience indicated that this 1% was not needed to finance the unemployment insurance program. Accordingly, Governor Earl Warren requested, and the legislature enacted, the Disability Insurance Program in which the 1% was used to cover those situations where unemployment was caused by *non*-job related illness or injury. "It is not possible," Warren said, "for employees to obtain from private insurance companies protection against loss of wages or salary during sickness as adequately or cheaply as the protection could be obtained by diverting their 1% contribution for the support of a Disability Benefits Program."[7]

Accordingly, there can be no serious question that these programs were conceived by the Legislature as *insurance* programs to be operated under insurance concepts.[8] Furthermore, there is little question that their objective was to protect against workers' loss of income by providing the broadest coverage and maximum benefits available within the

4. Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973). While the Court held 8–1 that the classification under attack violated the Equal Protection Clause of the 14th Amendment, only four (Justices Brennan, Douglas, White and Marshall) believed classifications based on sex to be 'suspect'. Three (Justices Powell, Blackmun, and the Chief Justice) specifically declined to take that step, Justice Stewart separately concurred that the statute worked an invidious discrimination and Justice Rehnquist dissented.

5. California Unemployment Insurance Code § 976.

6. California Unemployment Insurance Code § 100.

7. California Senate Journal, June 23, 1946 pp. 228–229.

8. *Gillum v. Johnson,* 7 Cal.2d 744, 62 P. 2d 1037, 63 P.2d 810 (1936) ; Calif. Comp. Ins. Co. v. Ind. Acc. Com., 128 Cal. App.2d 797, 276 P.2d 148 (1954) ; Garcia v. Ind. Acc. Com., 41 Cal.2d 689, 263 P.2d 8 (1953) ; Miller & Lux Inc. v. Ind. Acc. Com., 179 Cal. 764, 178 P. 960 (1919).

limit of funds generated by a 1% contribution.

Governor Warren's message to the legislature requested that the premiums be set at 1%. The fact that this was done and has been continued at 1% over the years would indicate a continuing determination on the part of the legislature to operate the program within that level of contribution. Further indication of this intent is found in Cal. Unemp.Ins.Code § 2604 which authorizes the director of the program (with approval of the Governor) to forestall any emergency insolvency in the fund by altering the scale of benefits, or increasing waiting time for benefits. He is not authorized to increase the contribution rate, a power retained exclusively in legislative hands.

Additional evidence of the legislative's continuing determination to retain the 1% contribution level can be drawn from a review of the progress of Senate Bill 419 through the most recently concluded session of the state legislature. As introduced on March 1, 1972, S.B. 419 would have amended § 2626 to allow maternity benefits[9] for periods beginning six (6) weeks before confinement and continuing nine (9) weeks thereafter, provided the claimant had been employed ten (10) months prior to the date of termination of the pregnancy. The bill was amended six (6) times before ultimate passage. The first amendment (June 5, 1972) allowed regular disability payments for specified abnormal conditions of pregnancy in addition to the originally proposed maternity benefits. The second amendment (June 20) increased employee contributions (up to a 73% increase) to cover the costs thereof, and the third (July 20) excluded maternity benefits and removed the proposed increased contributions. Coverage for specified abnormal conditions of pregnancy was retained. Thereafter it was once more amended (July 25) to provide additional revenue to cover the increased costs by increasing the level of income subject to the 1% contribution. After one final technical amendment (November 28) it was passed and presented to the Governor.

During all of its deliberations, the legislature had before it the cold, hard fiscal impact estimates which undoubtedly substantially affected its judgment in balancing employee contributions against benefits. For example, it was estimated that if S.B. 419 (as amended on June 5) became law, payments for basic disability benefits would increase $144.3[10] million (27.2%). The overall effect on the program would be to provide benefit payments equalling 142.4% of contributions. In its final form as passed by the legislature (and vetoed by the Governor) S.B. 419 covered only abnormal complications of pregnancy, excluded disabilities arising from therapeutic abortion, and provided necessary financing by increasing the ceiling on

9. It is possible to construe § 2626 as *impliedly* excluding maternity benefits associated with a normal pregnancy, since they arise neither from illness or injury, and *specifically* excluding benefits for illnesses or injuries arising in connection with complicated pregnancies until 28 days after the termination of the pregnancy. Plaintiffs reject this theory and contend that once a pregnancy compels a doctor to certify that the patient is unable to continue her employment, benefits should accrue whether the pregnancy be normal *or* complicated.

10. Defendant offers no explanation as to the variance between this figure and those offered for the purpose of this litigation (*supra* Note 3). The disparity however points up the difficulty of accurately estimating the fiscal impact of adding maternity benefits as well as the general economic magnitude thereof. Since this action affects only the Disability Insurance Benefits of the California Fund, and not similar public programs in other states, or similar private programs throughout the nation that could be subject to the same attack under Title VII of the Civil Rights Act of 1964, (as contended in the Amicus Curiae brief filed by the EEOC) the total financial consequences of the majority's opinion could be many times the initial $144 million involved here.

the amount of salary subject to the 1% contribution from $8,500 to $9,000.[11]

A review of the history of the legislative's treatment of *benefits* is also revealing. In each instance when the 1% contribution rate generated a surplus the legislature chose to spread it across the entire work force (including women in plaintiffs' claimed class) in the form of increased benefits rather than for financing the removal of the limitation on liability here under attack.[12] The sole amendment to § 2626 was one of form only and in essence reaffirmed the legislative policy of excluding liability for pregnancy related illness or injury for the period commencing with the incidence of the illness or injury and ending on the 28th day after the termination of the pregnancy.

Accepting as I do the legitimacy of these legislative objectives, it is difficult to imagine any statutory provision that could be more rationally related thereto, for without § 2626, the legislature would be compelled to either decrease expenditures by reducing overall benefit levels or increase contributions through higher rates or ceilings. Additionally the program is far from arbitrary. It is under constant legislative surveillance,[13] legislative action is preceded by thorough study and deliberation, and appears to be based on a careful balancing of the merits of increased benefits against the offsetting demerits of increased contributions.[14]

The majority holds that the purpose of § 2626 is purely economic and that ". . . the saving of cost cannot justify the classification." Page 800, *supra*. I disagree. Even though § 2626 is essentially economic in nature its broader objective of enabling the legislature to construct a comprehensive program of benefits at minimal cost to the participants is certainly valid. And there is ample authority that classifications based on economic consideration can be valid.[15] Furthermore, if all legislative enactments that produce unequal financial impact on various classes are to be deemed suspect—a not illogical result of the majority's reasoning . . . the courts would be compelled to inject themselves into just the kind of controversy the Supreme Court sought to avoid in *Dandridge* when it stated, ". . . the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients." Dandridge v. Williams, 397 U.S. 471, 487, 90 S.Ct. 1153, 1163, 25 L.Ed.2d 491 (1969).

The highest State Court to consider the validity of § 2626 reached this same conclusion. Clark v. California Employment State Com. 166 Cal.App.2d 326,

---

11. Even if enacted into law S.B. 419 would, under plaintiffs' reasoning, have been constitutionally defective.

12. The Section establishing the payment levels (§ 2655) was amended at least once in each of the following years: 1955; '57, '59, '61, '63, '65, '68 and '71. Over that period the minimum monthly benefit was raised from $10 to $25 and the maximum from $35 to $105. Provisions for Additional Benefits to cover hospitalization costs were added in 1953 (§ 2801) and were liberalized both as to amount and duration in 1953, 1957 and 1970.

13. A review of its entire legislative history shows that the Disability Benefits program has been amended no less than 241 times since its enactment in 1946.

14. In upholding the validity of the Texas school financing scheme Justice Powell was careful to point out . . . "The Texas plan is not the result of hurried, ill-conceived legislation. It certainly is not the product of purposeful discrimination against any group or class. On the contrary, it is rooted in decades of experience in Texas and elsewhere, and in major part is the product of responsible studies by qualified people." 411 U.S. 55, 93 S.Ct. 1308.

15. O'Gorman & Young v. Hartford Ins. Co., 282 U.S. 251, 51 S.Ct. 130, 75 L.Ed. 324 (1930) and Borden's Co. v. Baldwin, 293 U.S. 194, 55 S.Ct. 187, 79 L.Ed. 281 (1934).

332 P.2d 716 (1958). There, the plaintiff claimed the section subjected her to an unreasonable classification and deprived her of equal protection of the laws. In upholding the constitutionality of § 2626 the court said:

\* \* \* \* \* \*

"A statute which excludes individuals of a specified class from benefits conferred thereby does not violate constitutional guarantees of due process of law, equal protection of the law, or uniform application of the law, providing the classification adopted is reasonably related to the purpose of the statute and is based on some natural, intrinsic or constitutional distinction which suggests a reason for and justifies the exclusion . . . Such a classification must not be arbitrary or unreasonable, but must be characterized by some substantial qualities or attributes which render the particular exclusion from benefits necessary or appropriate."

\* \* \* \* \* \*

"It is a matter of common knowledge that illness or injury arising from pregnancy is classified and excluded from the coverage provided by private contracts of health and accident insurance, in order to effect a premium rate lower than is required in the absence of such an exclusion. It is reasonable to assume that the inclusion of illness or injury caused by pregnancy within the coverage provided by the statute would increase substantially the demands upon the Fund and require a like increase in the contribution rate. As these conclusions are within reason, the inquiry into conditions establishing them is a matter for the Legislature, . . . It was properly within the sphere of legislative action to determine whether the objects of the statute in question would be served best by including a disability benefit which reasonably might impose upon the majority of employees a burden disproportionate to contemplated benefits, in order to favor the minority who are included within the classified group. These reasons indicate that the class excluded was not arbitrarily selected, and that the purpose of the exclusion was germane to the legislative object." 166 Cal.App.2d at pp. 331–332, 332 P. 2d at pp. 718–719.

A further rationale for § 2626, and one which the legislature is far better equipped to evaluate than is the court, is a legislative desire to avoid a potential calculated exploitation of the program. As pointed out by the defendant the voluntary aspect of pregnancy could lead to planned use of the program which was not contemplated in the creation of the program and not possible in most other disabilities. In order for a worker to collect maximum benefits of $105 per week for 26 weeks, it is only necessary to earn $8,500 per year and have 1% of that sum, or $85.00 per year withheld as a disability insurance contribution. If pregnancy were covered, a woman not ordinarily pursuing a career, could go to work for one year, and would then be eligible to collect $2,730 in pregnancy benefits if her doctor will certify that she is temporarily disabled from working the full 26-week period.

## IV.

To the extent that § 2626 discriminates against women (it is exceedingly difficult to talk about equality of treatment between the sexes when pregnancy is involved), it does so reasonably. It is my opinion that the challenged statute is constitutionally valid and that by holding otherwise today the court is merely substituting its own judgment for that of the legislature.