506 F.Supp. 619 (1981)
The STATE OF NORTH DAKOTA, ex rel. BOARD OF UNIVERSITY AND SCHOOL LANDS, Plaintiff,
v.
Cecil ANDRUS, Secretary of the Interior; Bob Bergland, Secretary of Agriculture; Frank Gregg, Director of the United States Bureau of Land Management; and John R. McGuire, Chief of the United States Forest Service, Defendants.
No. A78-1092.
United States District Court, D. North Dakota, Southwestern Division.
February 4, 1981.
*620 *621 Thomas O. Smith, Asst. Atty. Gen., Bismarck, N. D., Owen L. Anderson, Asst. Atty. Gen., Grand Forks, N. D., and John W. Morrison, Jr., Asst. Atty. Gen., State Land Dept., Bismarck, N. D., for plaintiff.
Herbert Becker, Asst. U. S. Atty., Fargo, N. D., for defendants.

MEMORANDUM and ORDER
VAN SICKLE, District Judge.
This is a civil action by the State of North Dakota which seeks relief from the actions of the Secretary of the Interior, the Secretary of Agriculture, the Director of the United States Bureau of Land Management, and the Chief of the United States Forest Service, who are engaged in leasing portions of the bed of the Little Missouri River for oil and gas development, and in other proprietary activities incompatible with the State's claimed ownership of the Little Missouri River bed.
This Court has jurisdiction by virtue of 28 U.S.C. § 2409a (quiet title), and 28 U.S.C. § 1331 (federal question). The relief sought is available under 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment and further relief).
The Constitutional reference to actions between a state and the United States is:
"In all cases affecting Ambassadors, other public Ministers and Consuls, and those in which a State shall be a Party, the Supreme Court shall have Jurisdiction."
United States Constitution, Article III, Section 2.
Chief Justice Marshall assumed that the Supreme Court's original jurisdiction was also exclusive. The statutes from 1789 to the present have proceeded on a different theory and have distinguished between situations in which the Supreme Court is given exclusive jurisdiction and those in which its jurisdiction is concurrent with that of the lower federal courts. The validity of such a division is now settled. Charles Alan Wright, Law of the Federal Courts, 3d Ed., p. 556. Suit by a state against the United States is not permitted except in those instances where the United States has consented to be sued. Wright, supra, p. 558 and Utah v. U. S. (1969), 394 U.S. 89, 89 S.Ct. 761, 22 L.Ed.2d 99.
So in order to proceed further with this action, this Court must determine that:
a. The Supreme Court's jurisdiction in this action by a state against the United States, and testing a sovereign's entitlement to land, is not exclusive; and
b. That this is an area where the United States has consented to be sued.
The problem of exclusive jurisdiction: 28 U.S.C. § 2409a provides in part that:
"The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights."
Thus it seems clear that in actions to quiet title wherein the United States claims an interest, the Congress has empowered a district court to hear the matter. The State of North Dakota has selected this forum so there is no problem of its consent that the action be tried at this level. The Supreme Court may, of course, exercise its discretion to invoke its original jurisdiction,[1] *622 but until it does so there is no problem of its consent that the matter remain at the district court level.
The problem of consent to be sued: This is an instance where the United States has consented to be sued. See Utah, supra.
The first issue which must be resolved is the question of navigability of the Little Missouri River. As pointed out in Livingston v. United States, 627 F.2d 165 (8th Cir. 1980), "navigability" means different things under different circumstances.
But for our purposes "navigability" means navigability at the date of statehood, Utah v. United States, 403 U.S. 9, 91 S.Ct. 1775, 29 L.Ed.2d 279 (1971). A river is a navigable river when it is used or susceptible of being used in its ordinary condition as a highway for commerce over which trade and travel may be conducted in the customary modes of trade and travel on water, Utah, supra, p. 9, 91 S.Ct. p. 1775.
"The lake was used as a highway and that is the gist of the federal test." Utah, supra, p. 11, 91 S.Ct. p. 1776.
The entire valley of the Little Missouri River lies within the Louisiana Purchase of 1803. The Fort Berthold Indian Reservation was carved out of the federal public domain by the Act of March 3, 1891, 26 Statutes 1032, two years after the admission of North Dakota as a state, October 1, 1889.
The Three Affiliated Tribes have such an interest in this litigation that resolution of the claims to any portion of the bed of the Little Missouri River which lies wholly within the Fort Berthold Reservation can only be effective if the Three Affiliated Tribes are before the Court. The area of interest to the Three Affiliated Tribes is that portion of the river bed downstream from the west line of Section 31, Township 147 North, Range 92 West of the 5th Principal Meridian, Dunn County, North Dakota, to the mouth of the Little Missouri River. The Three Affiliated Tribes also have an interest in this litigation insofar as it may involve the bed of the stream along the southerly border of the Fort Berthold Reservation from a point on the west line of Lot 10 of Section 34, Township 148 North, Range 95 West of the Principal Meridian, to the aforementioned point on the west line of Section 31.
Therefore, any orders in this matter shall not be concerned with the bed of the Little Missouri River below the west line of Lot 10, Section 34, Township 148 North, Range 95 West.
The River's history of navigability and use for trade and travel predates the identification of the river by the Corps of Discovery.
Baptiste Le Page, a French Canadian, who had been in the Cote Noir (Black Hills) with the Cheyennes, came downstream on the Little Missouri to the Mandan Village on the Big Missouri at the mouth of the Knife River, near where the Corps of Discovery had built its winter quarters (Fort Mandan). On November 3, 1804 he was "signed on" with the Corps of Discovery.[2] And it is important to note that the Little Missouri River was the most convenient downstream route from the area of Devils Tower, northwest of the Black Hills to the Knife River settlement of Mandans, and as such was clearly an established channel of commerce between those two centers. Meriweather Lewis viewed the mouth of the river after discussing it with Le Page, and commented:
"The Little Missouri disembogues on the S. side of the Missouri 1693 miles from the confluence of the latter with the Mississippi, it is 134 yeards wide at it's mouth, and sets in with a bould current but it's greatest debth is not more than 2½ feet. It's navigation is extreemly difficult, owing to its rapidity, shoals and *623 sand bars it may however be navigated with small canoes a considerable distance. This river passes through the Northern extremity of the black hills where it is very narrow and rapid and it's banks high an(d) perpendicular. it takes it's rise in a broken country West of the Black hills with the waters of the yellow stone river, and a considerable distance S.W. of the point at which it passes the black hills."[3]
The river continued navigable into the turn of the century, witness the logging operation of Eber H. Bly, 1881 and 1882.[4] Finally, the river presently carries approximately 200 canoes each year. The trip usually runs from Medora to the Lost Bridge, where it terminates in the waters of Lake Sakakawea. However the trips can easily originate as far upstream as the Devils Tower.[5]
Thus I conclude that the Little Missouri River was navigable in fact on October 1, 1889, and continues to be navigable to this date.[6]
Since the Little Missouri River is a navigable stream, title to the bed of that stream is originally vested in the State of North Dakota.
The "Shively Doctrine" as articulated in Shively v. Bowlby, 152 U.S. 1, at 26-31, 14 S.Ct. 548, at 557-59, 38 L.Ed. 331 (1894) is that: There is a presumption that lands underlying navigable waters pass to the state upon its admission into the Union because of the Constitutional doctrine of equal footing. This doctrine rises not from an express Constitutional provision, but from the interpretation of the Constitution by the Supreme Court, that this country is a union of political equals. Case v. Toftus, 39 F. 730, p. 732 (C.C.D.Or.1889). The Shively Doctrine is also explained as consistent with enabling legislation which provides for admission of the state "on an equal footing with the original states." See United States v. Texas, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950), where the equal footing principle worked to the disadvantage of Texas. In the Enabling Act which provided for the statehood of North Dakota, the "equal footing" language reads:
"(North Dakota) ... shall be deemed admitted by congress into the union on an equal footing with the original states." The Enabling Act, Chapter 180, 25 U. S. Statutes at Large, 676 Sec. 7.
The original states of the Union, by virtue of the Revolution and their sovereignty, succeeded to the English Crown's title and dominion to the land underlying navigable waters. Thus it was held that:
"... to deny to the states admitted subsequent to the formation of the Union, ownership of this property would deny them admission on an equal footing with the original States, since the original States did not grant these properties to the United States, but reserved them to themselves." United States v. Texas, supra, p. 716, 70 S.Ct. p. 922.
In fact, once the factual issue of navigability is determined, North Dakota's entitlement to the riverbed is confirmed by the clear mandate of Congress found in 43 U.S.C. §§ 1301, 1303, 1311-1315 (Submerged Lands Act). Section 1311(a) reads:

*624 "It is determined and declared to be in the public interest that (1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors, in interest thereof; ...." 43 U.S.C. § 1311(a).[7]
While the United States refuses to concede that the Little Missouri River is navigable, despite the recommendation of its researchers that it be recognized to be navigable, it also claims that North Dakota cannot prevail in this case:
1. Because the United States has acquired title to the bed of the stream by adverse possession;[8] and
2. In any event, under 28 U.S.C. § 2409a(f), a statute of limitations has run against North Dakota.
The United States bases its claim of adverse possession on a history of oil and gas leasing, an apparent outgrowth of the leasing of national park lands, hay lands, and forest lands along the Little Missouri River.
But Section 164 of the Constitution of North Dakota provides that:
"No claim for the occupation, cultivation, or improvement of any public lands shall ever be recognized."
The public lands here involved are more than privately held by the state as proprietor; they are in fact held in trust for the people of North Dakota.
North Dakota has recognized that it holds these lands under the Public Trust Doctrine. United Plainsmen v. North Dakota State Water Commission, N.D., 247 N.W.2d 457. And the lands so acquired, and so held, are held by the state in its sovereign capacity. The United States Supreme Court said in Pollard's Lessee v. Hagen, et al., 44 U.S. 212, 3 How. 212, 11 L.Ed. 565 (1845):
"This right of eminent domain over the shores and the soils under the navigable waters, for all municipal purposes, belongs exclusively to the states within their respective territorial jurisdictions, and they, and they only, have the constitutional power to exercise it. To give to the United States the right to transfer to a citizen the title to the shores and the soils under the navigable waters, would be placing in their hands a weapon which might be wielded greatly to the injury of state sovereignty, and deprive the states of the power to exercise a numerous and important class of police powers.
. . . . .
By the preceding course of reasoning we have arrived at these general conclusions: First, The shores of navigable waters and the shores under them, were not granted by the Constitution of the United States, but were reserved to the states respectively. Secondly, The new states have the same rights, sovereignty, and jurisdiction over the subject as the original states."
Pollard's Lessee, supra, p. 230.
The doctrine of Pollard's Lessee was reaffirmed as late as 1977 in Oregon Ex Rel. State Land Board v. Corvallis Sand and Gravel Co., 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 574 (1977), where the Supreme Court said:
"(U)nder Pollard's Lessee, the State's title to lands underlying navigable waters *625 within its boundaries is conferred not by Congress but by the Constitution itself. The rule laid down in Pollard's Lessee has been followed in an unbroken line of cases which make it clear that the title thus acquired by the State is absolute so far as any federal principle of land titles is concerned. For example, in Weber v. Harbor Comm'rs, 18 Wall., at 65-66, 21 L.Ed. 798, the Court reaffirmed the doctrine of Pollard's Lessee:
Upon the admission of California into the Union upon equal footing with the original States, absolute property in, and dominion over, all soils under the tidewaters within her limits passed to the State, with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters ...."
(Emphasis supplied.)
These lands being held by the State of North Dakota in its sovereign capacity, and as trustee for the people of North Dakota, the provisions of Section 164, Constitution of North Dakota, simply confirm the rule that North Dakota can never abdicate its trust obligation. Illinois Central Railroad v. Illinois, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892).
Neither doctrines of laches, nor statutes of limitation of actions can be allowed to defeat the state's sovereign title to trust lands.
In Carr v. Moore, 119 Iowa 152, 93 N.W. 52 (54-55), the rule was succinctly stated:
"Whether the title to the bed remained in the United States or passed to the State, no adverse possession thereof would be effectual, for the statute of limitations does not run as against the sovereign."
28 U.S.C. § 2409a(f) provides:
"Any civil action under this section shall be barred unless it is commenced within twelve years of the date upon which it is accrued. Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."
The legislative history of the statute shows that Congress intended it to apply exclusively to persons, be they private citizens or private or public corporations. See 1972 U.S.Code Cong. & Admin.News 4547-4557. In all of the cases cited by defendant not one concerned, as in this case, an effort to defeat a claim by a sovereign to trust lands held in its sovereign capacity.[9]
Justice Story said, in an action in debt against sureties of one, Reed, tax collector, who claimed laches as a defense:
"The general principle is, that laches is not imputable to the government; ... not in the notion of extraordinary prerogatives, but upon a great public policy." U. S. v. Kirkpatrick, and others, 22 U.S. (Wheaton 9) 720, 735, 6 L.Ed. 199 (1824).
In Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 Justice Stone said:
"The rule quod nullum tempus occurrit regi  that the sovereign is exempt from the consequences of laches, and from the operation of statutes of limitations  appears to be a vestigial survival of the prerogative of the Crown. (cases cited) But whether or not that alone counts for its origin, the source of its continuing vitality where the royal privilege no longer exists is to be found in the public policy now underlying the rule even though it may in the beginning have had a different policy basis. Compare Maine, Ancient Law (10th Ed., 1930) 32 et seq. "The true reason is to be found in the great public policy of preserving the public rights, revenues and property from *626 injury and loss, by the negligence of public officers. And though this is sometimes called a prerogative right, it is in fact nothing more than a reservation, or exception, and equally applicable to all governments." (cases cited)."
This rule the United States has applied to its benefit in resolving claims of title to submerged lands. In United States v. California, 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947), the Supreme Court held:
"The Government (the United States) which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act."
Finally, to allow the administrative officers of the United States to prevail in their effort to claim these lands is directly contrary to and in defiance of the expressed will of the Congress, as found in 43 U.S.C. § 1311(a), quoted earlier in this memorandum.
And as shown by the legislative history of the Submerged Lands Act, as found in 1953 U.S.Code Cong. & Admin. News, Commencing at page 1385, a purpose of the Act was to turn the matter of issuing oil and gas leases to the beds of navigable waters over to the State once and for all.
And 28 U.S.C. § 2409a(d) mandates that if the United States disclaims an interest in real property (for example, the declaimer contained in 43 U.S.C. § 1311(b)(1)), no decision in the district court can find against that disclaimer.
Plaintiffs have raised a Tenth Amendment claim. But since the matter is resolvable without reaching the constitutional issue, that claim is not here discussed.
For the reasons stated and to the extent therein indicated, I conclude that the plaintiff is entitled to the relief sought. Counsel for the State of North Dakota will forthwith prepare and submit an appropriate form of judgment in conformity herewith.
IT IS SO ORDERED.
NOTES
[1] The Supreme Court's usual exercise of jurisdiction is through certiorari. Rule 19 of the Supreme Court Rules includes, among other grounds for certiorari, that it may be granted when the Court of Appeals has sanctioned a departure by a lower court from the accepted and usual course of judicial proceedings.
[2] Lewis and Clark Journals, Thwaites, Vol. 1, p. 216.
[3] Journals, supra, Vol. 1, p. 298. Clark in his journal entry for the same day says:

"One of our men, Baptiest, who came down this river in a canoe, informs me that it is not navigable. He was 45 days descending." Journals, supra, Vol. 1, p. 300.
But of course he did navigate it, and late in the fall when the river is at its very lowest.
[4] Bismarck Tribune, June 14, 1882. Bly contracted to cut rail ties near Marmarth, North Dakota, south and upstream from the Northern Pacific crossing at the town of Little Missouri (near Medora). He went bankrupt but he floated down the logs.
[5] See letter of Chief Ranger, September 17, 1980.
[6] In the evidence is a report entitled "Little Missouri River Navigability Study," prepared for the United States Corps of Engineers and dated June 20, 1975, wherein the researchers conclude at page 18 that:

"Due to historical and potential use, it is recommended that the Little Missouri River be classified as a navigable waterway of the United States." (Exhibit 1)
[7] The "sovereignty analysis" relies heavily on an outstanding note by Rebecca S. Thiem in Vol 55, No. 3, NDLR, p. 455, et seq.
[8] The law of proof of open notorious and adverse possession through use of recorded instruments requires careful consideration of the scope, extent, continuity, and terms of the adverse possession evidenced by those instruments. This type of information was not furnished.
[9] This Court has just had the privilege of reviewing State of California ex rel. State Lands Commission v. United States of America, United States District Court, Northern District of California, No. C 79-1865 RPA, filed January 6, 1981. It is the only case which this Court has found that has met the issue of the sovereign's capacity to protect its trust lands.

But see Park County, Montana v. United States, 626 F.2d 718 (9th Cir. 1980), (contra).