STATE OF NORTH DAKOTA, ex rel.
BOARD OF UNIVERSITY AND
SCHOOL LANDS, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. A1–88–122.

United States District Court,
D. North Dakota,
Southwestern Division.

June 28, 1991.

Charles M. Carvell, Bismarck, N.D., for plaintiff.

Cameron W. Hayden, Asst. U.S. Atty., Bismarck, N.D., K. Jack Haugrud, Michael W. Reed, U.S. Dept. of Justice, General Litigation Section, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BENSON, Senior District Judge.

This case was brought on for trial before the court to resolve one issue: whether the Little Missouri River was navigable when North Dakota was admitted to the union and thus became a state in 1889.

Under the Equal Footing Doctrine, title to the beds of those rivers which were navigable at the time of statehood passes to the state upon its admission to the union. Title to the beds of rivers that were not navigable at the time of statehood remains in the United States. *See United States v. Utah*, 283 U.S. 64, 75, 51 S.Ct. 438, 440–41, 75 L.Ed. 844 (1931); *see also* Submerged Lands Act, 43 U.S.C. § 1311 (confirming States' title to and ownership of the lands beneath navigable waters within their boundaries).

North Dakota contends that the Little Missouri River was navigable at the time of statehood. Accordingly, North Dakota claims that it is entitled to ownership of the riverbed. The United States contends that the river was not navigable at the time of

statehood and that it retains title to all portions of the riverbed along which it is a riparian owner.

### I. Procedural History

This case had its genesis in 1978 when North Dakota brought suit to enjoin the United States from leasing portions of the Little Missouri River bed for oil and gas development and from exercising other privileges of ownership over the riverbed. At the trial of that action,[1] North Dakota introduced documentary evidence in support of its claim that the river was navigable at the time of statehood and that the State upon its admission to the union thereby acquired title to the riverbed.

The United States denied the river was navigable, but presented no evidence on that issue. Instead, the United States presented evidence in support of its assertion that the State's action was barred by the Quiet Title Act's twelve-year statute of limitations. The United States District Court for the District of North Dakota held that the statute of limitations did not apply to quiet title actions brought by states. The court further held that the river was navigable at the time of statehood and granted North Dakota the requested relief. *North Dakota ex rel. Board of Univ. & School Lands v. Andrus*, 506 F.Supp. 619 (D.N.D.1981) (Van Sickle, J.), *aff'd*, 671 F.2d 271 (8th Cir.1982).

On certiorari, the United States Supreme Court reversed and remanded, holding that the Quiet Title Act provides the exclusive means to challenge the United States' title to real property and that the statute of limitations in the Quiet Title Act does apply to the states. *Block v. North Dakota ex rel. Board of Univ. & School Lands*, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983).[2]

On remand[3] the district court received additional evidence on the statute of limitations issue. The court held that the statute

1. *See Block v. North Dakota ex rel. Board of Univ. & School Lands*, 461 U.S. 273, 278–79 & nn. 5–6, 103 S.Ct. 1811, 1815 & nn. 5–6, 75 L.Ed.2d 840 (1983) (discussing the trial).

2. The Supreme Court did not address the issue of the river's navigability.

3. *See North Dakota ex rel. Board of Univ. & School Lands v. Block*, 789 F.2d 1308, 1311–12 (8th Cir.1986) (discussing the district court proceeding.

of limitations barred the State's action only as to specific tracts for which the State had actual or constructive notice of the United States' claims. With respect to the remaining tracts, the court quieted title to the riverbed in North Dakota.

The court of appeals reversed, holding that the notice to the State was sufficient for the entire riverbed and that the statute of limitations therefore barred the action in its entirety. The case was remanded to the district court with directions to dismiss the complaint. *North Dakota ex rel. Board of Univ. & School Lands v. Block*, 789 F.2d 1308, 1312–14 (8th Cir.1986).

North Dakota commenced the action now before the court after Congress amended the Quiet Title Act to allow states to sue the federal government without regard to the twelve-year statute of limitations under some circumstances. Pub.L. No. 99–598, 100 Stat. 3351 (1986) (relevant amendment codified at 28 U.S.C. § 2409a(g)).

In this action, North Dakota seeks to quiet title against the United States for all portions of the riverbed to which the United States claims fee ownership.[4]

The court notes that in its answer, the United States asserted that the State's action was barred by the statute of limitations. However, prior to trial, the United States informed the court that it did not intend to pursue that affirmative defense.[5] Thus, the only issue before the court is whether the Little Missouri River was navigable at the time of statehood.[6]

## II. Discussion

■ In a title dispute between a state and the United States, the question of whether a river is navigable is a federal question which is to be decided by a federal test. *United States v. Oregon*, 295 U.S. 1, 14, 55 S.Ct. 610, 615, 79 L.Ed. 1267 (1935). The federal test for determining navigability in title adjudications is derived from *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870), in which the Supreme Court stated:

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.

*Id.* at 563. The Court later refined the test, stating:

[N]avigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels, or flatboats—nor on an absence of occasional difficulties in navigation, but on the fact, if it be a fact, that the stream in its natural and ordinary condition affords a channel for useful commerce.

---

**4.** The lands at issue are described in paragraph 12 of the First Amended Complaint:

12. In particular, the State of North Dakota claims fee simple title to the bed of the Little Missouri River up to the ordinary high water mark as the river runs through the federally owned properties of the Little Missouri National Grasslands, the Theodore Roosevelt National Park, the Theodore Roosevelt Wilderness and as the river runs through any other federally owned lands, including lands managed by the Bureau of Land Management. Excluded from this lawsuit is that portion of the riverbed downstream from the southwest boundary of the Fort Berthold Indian Reservation, which begins at about the west line of Lot 10 of Section 34, Township 148 North, Range 95 West, Dunn County, North Dakota.

**5.** The United States also informed the court that it did not intend to pursue the other affirmative defenses asserted in its answer: failure to state a claim upon which relief can be granted; failure to join indispensable parties; and lack of subject matter jurisdiction.

The court has nevertheless independently examined the basis of its jurisdiction over the subject matter of this lawsuit. The court is satisfied that it has jurisdiction over this quiet title action pursuant to 28 U.S.C. §§ 2409a, 1346(f).

**6.** The district and circuit courts' earlier holdings on the issue of navigability have no relevance in the present action. As the court of appeals concluded, the trial court was without jurisdiction to inquire into the merits and "[e]ntered in the absence of jurisdiction, the entire judgment must be reversed." *North Dakota ex rel. Board of Univ. & School Lands v. Block*, 789 F.2d 1308, 1314 (8th Cir.1986).

*United States v. Holt State Bank*, 270 U.S. 49, 56, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926).

Thus, a river is navigable in law and in fact if, at the time of statehood, it (1) was used or susceptible of being used (2) in its natural and ordinary condition (3) as a highway for useful commerce (4) in the customary modes of trade and travel on water. "[T]he vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce." *United States v. Utah*, 283 U.S. 64, 86, 51 S.Ct. 438, 445, 75 L.Ed. 844 (1931).

North Dakota bears the burden of proving that the Little Missouri River was navigable at the time of statehood. *See Iowa–Wisconsin Bridge Co. v. United States*, 84 F.Supp. 852, 867 (1949), *cert. denied*, 339 U.S. 982, 70 S.Ct. 1020, 94 L.Ed. 1386 (1950). The task before the court is to determine whether North Dakota has met its burden of proof. In reaching its determination, the court has had the benefit of the trial transcript, the trial exhibits, and the parties' post-trial briefs.

North Dakota has primarily attempted to meet its burden by presenting historical accounts of Eber Bly's tie drive on the river; ferry use on the river; and use of the river by the Mandan and Hidatsa Indian tribes. It also relies upon evidence of modern day canoe travel on the river and statistical evidence of the river's "boatability."

### Bly's Tie Drive

North Dakota has presented evidence of a tie drive conducted by Eber Bly in the 1880s. It contends that this evidence alone is sufficient to prove navigability. The court disagrees and finds that the evidence of the tie drive is not a sufficient basis for a finding of navigability.

In May 1880, Eber Bly contracted with the Northern Pacific Railroad to deliver between 50,000 and 100,000 ties to its crossing on the Little Missouri River where Medora, North Dakota, is presently located.[7] The ties were to be used to construct a section of railroad between Bismarck, North Dakota, and the Yellowstone River. Bly apparently planned to cut ties in the pine stands of southeastern Montana and float them down the Little Missouri River to the railroad crossing at Medora. *See* Ex. D–94a(xii).

Bly cut between 90,000 and 100,000 ties. However, none of the ties reached the railroad crossing in 1880. The Northern Pacific's annual report, dated August 24, 1880, reported: "The cross-ties and the piles were cut; the piles put in the river, and the ties ready on the bank, but up to this writing the river has remained all the season too low to float them. The piles have been worked down about 50 miles, where they remain, and the prospect for getting them down in time to be of service, is very remote." *Id.*

Few, if any, ties arrived in 1881. The Northern Pacific records reveal that as of July 21, 1881, "The cross-ties (about 90,000 in number) cut on the Little Missouri have failed to come down. A large amount of pile timber was also cut up the same stream, none of which has been received." Ex. D–94a(xiv).

The United States contends that in the summer of 1881, Bly established another camp called Logging Camp Ranch which was only forty-five "river" miles south of the railroad crossing at Medora. The evidence shows that Bly hauled some of his ties overland to the Logging Camp Ranch where he dumped them into the Little Mis-

---

7. Bly's contract, dated May 18, 1880, provided in part:

   I will as your agent make and deliver at the Rail Road Crossing on the Little Missouri River during the year 1880 Fifty to one Hundred Thousand Pine Cross Ties

   . . . . .

   [I]n case the water is so low that I am unable to drive the ties down the stream during the year 1880 the same may be delivered in the year 1881 and paid for in the same manner as if they had been delivered in the year 1880 but I will if possible deliver them this year.
   Ex. D–94a(viii).

souri River to float up to the railroad crossing.

In June 1882, the *Bismarck Tribune* reported: "The chances are now that the large number of ties that Messrs. Bly and Roberts have had ready to float down to the Little Missouri to the railroad during the past two years, will reach their destination. That stream is very high at present, and still booming." Ex. D–94d (excerpt from the *Bismarck Tribune,* June 16, 1882, at 8). The newspaper later reported that about 47,000 ties arrived that year. Ex. D–94d (excerpt from the *Bismarck Tribune,* Aug. 11, 1882, at 7). The court notes that the reliability of this figure is questionable. The *Bismarck Tribune* had reported earlier that Bly cut four hundred thousand ties—a report for which the court finds no factual support in the record. *See* Ex. D–94d (excerpt from the *Bismarck Tribune,* June 16, 1882, at 7).

Finally, in May 1883, the *Bismarck Tribune* reported:

> E.H. Bly last evening received the cheering information that at last all his ties were safely corralled in the boom at the Little Missouri. He has been three years getting those ties down the river and he is tie-rd of the business as a matter of course. The contract has, under the circumstances, been a losing one, and at times he has had over $60,000 tied up and a gang of forty men waiting all summer for providence to provide rain and swell the river sufficiently to make the run. The Little Missouri was higher yesterday at the crossing of the North Pacific than it has ever been known before.

Ex. D–94d (excerpt from the *Bismarck Tribune,* May 25, 1883, at 8). Although the newspaper indicated that all of Bly's ties arrived in 1883, the United States' expert, Mr. Muhn testified that he believed

only 25,000 ties arrived in total—19,000 in 1882 and 6,000 in 1883. Mr. Muhn derived those figures from a Northern Pacific Railroad memorandum/payment voucher which was attached to Bly's contract. T. 469–474; Ex. D–114.

Upon Bly's passing, the newspaper recalled that Bly's tie drive "resulted disastrously from a financial standpoint, owing to the low stage of water and unconfined banks of the river, which rendered it impracticable to carry out the venture." Ex. D–94d (excerpt from the *Bismarck Tribune,* Sept. 16, 1901, at 3). There is no evidence that anyone again attempted such a commercial enterprise on the Little Missouri River.

The Supreme Court has stated: "The mere fact that logs, poles and rafts are floated down a stream *occasionally and in times of high water* does not make it a navigable river." *United States v. Rio Grande Dam & Irrigation Co.,* 174 U.S. 690, 698, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899) (emphasis added). The court concludes that the historical record of Bly's effort to float ties down the Little Missouri supports the contention of the United States that it was not a navigable river. The evidence demonstrates that tie-driving on the Little Missouri was not merely "occasional," it was an unique, isolated venture.[8] Furthermore, the evidence demonstrates that the ties which eventually reached the railroad crossing arrived only because of periods of high water. In 1882, when ties arrived, the newspaper reported that the river was "very high ... and still booming." When additional ties arrived in 1883, the newspaper reported that the Little Missouri was "higher ... at the crossing ... than it has ever been known before." Thus, the evidence of Bly's tie drive does not establish that the river afforded a channel for useful commerce.[9]

---

**8.** The evidence presented here is readily distinguishable from that which formed the basis of the Ninth Circuit Court of Appeals' finding of navigability in *Oregon v. Riverfront Protection Ass'n,* 672 F.2d 792 (9th Cir.1982). In that case, the court found that the log drives were not dependent on high water and were not "occasional." *Id.* at 795. The court noted: "Most drives on the McKenzie were held in April, May,

and early June over a period of seventeen years. Thousands of logs and millions of board feet of timber were driven down the river. Such use of the McKenzie was not occasional." *Id.*

**9.** *Cf. United States v. Utah,* 283 U.S. 64, 86–88 & n. 12, 51 S.Ct. 438, 444–445 & n. 12, 75 L.Ed. 844 (1931) ("The use of that portion of the river for transportation boats has been exceptional and

### Ferries on the River

North Dakota has presented evidence of the existence of ferries at two points on the Little Missouri River. North Dakota contends that the existence of ferries can prove navigability. The court finds the evidence of ferries on the Little Missouri River does not support a finding of navigability.

North Dakota has established the existence of cable ferries at Watford City and Marmarth in the early 1900s.[10] Cable ferries are ferries which are attached to a cable that is strung across a river from two relatively high points, towers, or posts. T. at 201. The ferries functioned as bridges where funds were not available to construct traditional bridges[11] and were rendered unnecessary after bridges were built. T. at 260–261. The ferries were used only to provide crossings on the river; they were not used to transport persons up or down the river. T. at 260.

The ferries on the Little Missouri served the sole purpose of providing passage across the river. Although the ferries operated on the water, they were the functional equivalents of bridges. The existence of a bridge on a river may establish that the bed of the river is covered at times by water too deep or too wide at a given point to be crossed by foot, by horse, or by automobile; however, it does not establish that the river is a channel for useful commerce. On the contrary, the existence of a bridge, or a ferry, establishes that the river is an obstruction to commerce which must be overcome. Clearly, those persons who used the ferries to cross the river would have had less difficulty making their trips had the river not existed. The river was not a channel for useful commerce.

Upon the foregoing analysis and in the absence of persuasive caselaw to the contrary, the court concludes that the use of ferries on the Little Missouri River does not support a finding of navigability.

### Use by the Mandan and Hidatsa Indians

North Dakota has presented evidence that the Mandan and Hidatsa Indians used the Little Missouri River. North Dakota contends that this evidence alone is sufficient to prove navigability. Upon careful consideration of the record evidence, the court concludes that this evidence does not provide a basis for a finding of navigability.

North Dakota has introduced into evidence the works of Dr. Alfred Bowers, an anthropologist, which indicate that in the 1700s, prior to the introduction of the horse, the Mandan and Hidatsa Indians who lived along the Missouri River travelled overland to the Little Missouri River region to hunt in the fall. Bowers indicates that they returned to their villages on the Missouri River in the late fall or spring by floating down the Little Missouri River in craft known as "bullboats," which apparently have a draft of only four to eight

necessarily on high water, was found impractical, and was abandoned. The rafting of logs or freight has been attended with difficulties precluding utility. There was no practical susceptibility to use as a highway of trade or travel." (quoting *United States v. Brewer–Elliott Oil & Gas Co.*, 249 F. 609, 623 (W.D.Okl.1918), *aff'd*, 270 F. 100 (8th Cir.1920))).

**10.** The ferry at Marmarth was operational for only a few months in 1915 before it was sunk by high water. T. at 260.

**11.** Ex. P–19 (excerpt from the *Watford Guide*, Aug. 28, 1924):

All waterways intersecting with North Dakota state highways can be crossed at the intersection, according to information given out today by the State Highway Commission in answer to a query as to whether or not the Little Missouri River could be crossed on State Route Number 25 between Killdeer and Watford City.

While it has not been possible for the Highway Commission, with its limited funds, to construct bridges over every stream and river, ferry boats are in operation on every state road intersection with a river or stream which has not been bridged. This in substance was the reply given to the query concerning the route over Number 25. The road runs from Killdeer to Watford City, the crossing over the Little Missouri being effected by a river power ferry. Similar ferries take the place of bridges at all other crossings for which the commission cannot furnish funds with which to erect bridges.

inches.[12]  The Indians apparently depended on autumn rains or the spring rise in order to make their trips.  Bowers notes that the bullboats could not be used every fall "for frequently after a dry summer the stream was nearly dry."  Ex. D–941 at 166.

The United States' expert, Mr. Muhn, testified that he had reviewed the works of numerous individuals who had contact with the Mandan and Hidatsa in the 18th and 19th centuries.  Although some of these individuals documented use of bullboats on neighboring rivers, none other than Dr. Bowers mentioned bullboat use on the Little Missouri River.  *See* T. at 413–431; Ex. D–93 at 5–8.[13]  Only Dr. Bowers, who did his work in the 1940s and 1950s, indicated that the Indians used bullboats on the Little Missouri River.  Thus, the court concludes this evidence is entitled to little weight.  Furthermore, even if considered, this evidence does not support a finding of navigability.  There is no evidence that the river was used as a highway for useful commerce.  The river did not provide a reliable means of transportation for the Mandan and Hidatsa and bullboat use on the Little Missouri River was largely abandoned after introduction of the horse. North Dakota contends that Dr. Bowers is substantiated by Meriwether Lewis who, in April of 1805, wrote that although the Little Missouri River's "navigation is extreemly [sic] difficult, owing to it's [sic] rapidity, shoals and sand bars it may however be navigated with small canoes a considerable distance."  Ex. 56.  Lewis' observation is not particularly significant, however, because the basis for his observation is unknown and his observation was apparently made in the spring during a time of high water.  Furthermore, Lewis also wrote on another occasion that the river was *not* navigable based upon the account of Baptiste LePage, who had journeyed forty-five days down the Little Missouri River in a "canoe" and had concluded that the river was not navigable.

*Other Uses of the River*

The remainder of North Dakota's evidence consists primarily of isolated trips on the river from the 1880s to 1920s, modern day canoe trips on the river, and statistical analysis of the river's "boatability."

■ The evidence of isolated trips on the river from the 1880s to 1920s demonstrates that the river was used only occasionally and in times of high water.  This evidence does not provide a sufficient basis for a finding of navigability.

> It is not ... every small creek in which a fishing skiff or gunning canoe can be made to float at high water which is deemed navigable, but, in order to give it the character of a navigable stream, it must be generally and commonly useful to some purpose of trade or agriculture.

*The Montello,* 87 U.S. (20 Wall.) 430, 442, 22 L.Ed. 391 (1874) (citation omitted).

North Dakota contends the evidence of canoe trips in more recent times demonstrates that the river was susceptible to use for commercial purposes by craft with similarly shallow drafts near the time of statehood.  The court finds this evidence demonstrates that the river may be susceptible to canoe travel occasionally and in times of high water—generally, in April and May.  This modern evidence of "susceptibility" must be considered in relation to the contemporary evidence of use and susceptibility at the time statehood.  The contemporary evidence indicates that the river was neither used nor susceptible to use as a highway for useful commerce.

■ North Dakota has also presented a statistical analysis of the Little Missouri River's "boatability."  Ex. 77.  The court is not persuaded that this analysis is a reliable indicator of the river's navigability at the time of statehood.

### III.  Conclusion of Law

Upon the record evidence and applicable law, the court concludes that North Dakota

---

**12.**  Bullboats were saucer-shaped craft, approximately four to six feet in diameter, which were made by stretching large animal skins over pole frames.

**13.**  Mr. Muhn prepared exhibit D–93, an historical examination of the Little Missouri River.

has failed to prove by a preponderance of the evidence that the Little Missouri River was a navigable river when North Dakota was admitted to the union and became a state in 1889.

## IV. ORDER FOR JUDGMENT

IT IS ORDERED that judgment be entered for the dismissal of plaintiff's first amended complaint with prejudice.