STATE OF NORTH DAKOTA, ex rel.
BOARD OF UNIVERSITY AND
SCHOOL LANDS, Appellant,

v.

UNITED STATES of America, Appellee.

No. 91–2725.

United States Court of Appeals,
Eighth Circuit.

Submitted May 14, 1992.

Decided Aug. 10, 1992.

Charles Carvell, Bismarck, N.D., for appellant.

John T. Stahr, Washington, D.C., for appellee.

Before McMILLIAN, JOHN R. GIBSON and MAGILL, Circuit Judges.

McMILLIAN, Circuit Judge.

The State of North Dakota (North Dakota or State) appeals from a final order entered in the United States District Court[1] for the District of North Dakota holding that the United States has title to the riverbeds of the Little Missouri River (Little Missouri or River), because the State failed to prove by a preponderance of the evidence that the River was navigable when North Dakota became a state in 1889, as required under the "equal footing" doctrine in order for the State to have title. *North Dakota ex rel. Bd. of Univ. & School Lands v. United States*, 770 F.Supp. 506 (D.N.D.1991) (memorandum opinion). For reversal, the State argues that the district court erred in finding that the Little Missouri River was not navigable in 1889. For the reasons discussed below, we affirm the order of the district court.

---

**1.** The Honorable Paul Benson, Senior United States District Judge for the District of North

## I. PROCEDURAL HISTORY

In 1978, the State brought an action in federal district court to determine title to certain portions of the riverbed of the Little Missouri River in North Dakota where it runs through federally-owned lands. *North Dakota ex rel. Bd. of Univ. & School Lands v. Andrus*, 506 F.Supp. 619 (D.N.D.1981) (*Andrus I*), aff'd, 671 F.2d 271 (8th Cir.1982) (*Andrus II*), rev'd sub nom. *Block v. North Dakota ex rel. Bd. of Univ. & School Lands*, 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (*Andrus III*). The State sought to enjoin the United States from leasing portions of the riverbed for oil and gas development and from exercising other privileges of ownership. The State asserted title pursuant to the "equal footing" doctrine and the Submerged Land Act of 1953, which provide that title to the riverbeds of those rivers which were navigable at the time of statehood vests with the state upon its admission to the union. Title to the riverbeds of rivers that were not navigable at the time of statehood remains in the United States. 43 U.S.C. § 1311(a); *see United States v. Utah*, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931). The State introduced documentary evidence in support of its claim that the River was navigable at the time of statehood and the State, upon its admission to the union, thereby acquired title to the River. *See Andrus III*, 461 U.S. at 278–79 & nn. 5–6, 103 S.Ct. at 1815 & nn. 5–6 (discussing the trial).

The United States denied the River was navigable, but introduced no evidence to support that position. Instead, the United States argued that the State's claim was barred by the Quiet Title Act's twelve-year statute of limitations. The district court held that the statute of limitations did not apply to quiet title actions brought by states. *Andrus I*, 506 F.Supp. at 625. The district court ruled on the merits that the River was navigable at the time of state-

---

Dakota.

hood and granted North Dakota the requested relief. *Id.* at 623.

On appeal this court agreed that the Quiet Title Act did not apply to the states. *Andrus II,* 671 F.2d at 274. We reviewed the State's evidence of navigability and affirmed the district court's decision that the Little Missouri River was navigable. *Id.* at 278.

The Supreme Court reversed and remanded, holding that states are subject to the Quiet Title Act's statute of limitations. *Andrus III,* 461 U.S. at 290, 103 S.Ct. at 1821–22. The Supreme Court did not address the issue of the River's navigability.

On remand the district court received additional evidence on the statute of limitations issue. The district court held that the statute of limitations barred the State's action only as to specific portions of the riverbed for which the State had actual or constructive notice of the United States' claims. With respect to the other areas, the district court quieted title to North Dakota. *See North Dakota ex rel. Bd. of Univ. & School Lands v. Block,* 789 F.2d 1308, 1311–12 (8th Cir.1986) (*Block*) (discussing the district court proceeding).

On appeal, this court reversed, holding that "the facts as found by the district court lead ineluctably to the conclusion that North Dakota was put on notice of the United States' claim of ownership interest in all of the riverbed" and that the statute of limitations therefore barred the entire action. *Id.* at 1312. The case was remanded to the district court with instructions to dismiss the complaint. *Id.* at 1314.

Congress amended the Quiet Title Act in 1986, exempting states, for certain purposes, from the statute of limitations of the Act.[2] The State then filed the present action, again seeking to quiet title against the United States for all portions of the riverbed to which the United States claims fee ownership. A bench trial was held from October 15 to October 18, 1990. The district court was not bound by the factual findings made in *Andrus I.*[3] On the merits, the district court held that the State failed to prove by a preponderance of the evidence that the Little Missouri was a navigable river when North Dakota became a state in 1889.[4] 770 F.Supp. at 512–13. North Dakota then filed this timely appeal.

## II. DISCUSSION

The sole issue on appeal is whether the district court's finding that the Little Missouri was not navigable in 1889 when North Dakota became a state is clearly erroneous. If the River was navigable at that time, North Dakota obtained title to the riverbed. If the River was not navigable, the United States retains title to the riverbed.[5]

In a title dispute between a state and the United States, the question of whether a river was navigable at the time of statehood is one of federal law. *United States v. Oregon,* 295 U.S. 1, 15, 55 S.Ct. 610, 616, 79 L.Ed. 1267 (1935). The original case establishing the federal standard, *The Daniel Ball,* 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1871), provides that:

Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in

---

2. This court on remand noted that its decision "may require North Dakota to adopt a different line of attack." *North Dakota ex rel. Bd. of Univ. & School Lands v. Block,* 789 F.2d 1308, 1314 (8th Cir.1986). North Dakota apparently heeded this court's advice and led an initiative to amend the Quiet Title Act.

3. Because North Dakota's suit was time-barred by the statute of limitations of the Quiet Title Act, "the courts below had no jurisdiction to inquire into the merits." *Block v. North Dakota ex rel. Bd. of Univ. & School Lands,* 461 U.S. 273, 292, 103 S.Ct. 1811, 1822–23, 75 L.Ed.2d 840 (1983).

4. The district court judge who heard this action was not the same judge who presided over the earlier action.

5. The district court's findings of fact will not be reversed unless clearly erroneous. *Rogers v. Masem,* 788 F.2d 1288, 1292 (8th Cir.1985). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1984).

fact when they are used, or are suscepti-
ble of being used, in their ordinary condi-
tion, as highways for commerce, over
which trade and travel are or may be
conducted in the customary modes of
trade and travel on water.

The Supreme Court later refined the test:
[N]avigability does not depend on the
particular mode in which such use is or
may be had—whether by steamboats,
sailing vessels or flatboats—nor on an
absence of occasional difficulties in navi-
gation, but on the fact, if it be fact, that
the stream in its natural and ordinary
condition affords a channel for useful
commerce.

*United States v. Holt State Bank,* 270 U.S.
49, 56, 46 S.Ct. 197, 199, 70 L.Ed. 465 (1926)
(*Holt Bank*).

■ At trial, the State had the burden of
proving by a preponderance of the evidence
that the Little Missouri River was naviga-
ble at the time of statehood. *Iowa–Wis-
consin Bridge Co. v. United States,* 84
F.Supp. 852, 867, 114 Ct.Cl. 464 (1949), *cert.
denied,* 339 U.S. 982, 70 S.Ct. 1020, 94
L.Ed. 1386 (1950). Thus, based on the
above standards, the State was required to
prove that the River (1) was used or was
susceptible of being used, (2) as a highway
of useful commerce, (3) in its natural and
ordinary condition, and (4) by the custom-
ary modes of trade and travel at the time
of statehood. *Holt Bank,* 270 U.S. at 56,
46 S.Ct. at 199.

■ North Dakota attempted to meet its
burden of proof primarily by presenting
historical evidence of: a tie drive[6] that
took place on the River in the early 1880s;
use of the River by the Mandan and Hidat-
sa Indian tribes; ferry use on the River;
and the Lewis and Clark journals. The
State also relied on present day recreation-
al canoe use of the River to prove naviga-
bility.

### A. *Eber Bly's Tie Drive*

The State presented evidence of a tie
drive that took place in the early 1880s in
support of its claim that the river was
navigable in 1889. In May of 1880 a Bis-
marck businessman, Eber Bly, contracted
with the Northern Pacific Railroad to deliv-
er about 50,000 to 100,000 railroad ties to
the railroad's Little Missouri River cross-
ing, which was at the future location of the
town of Medora. He promised to deliver
the ties in 1880 and 1881. The ties were to
be used to build a segment of the railroad
between the Little Missouri and the Yellow-
stone River in Montana. Bly planned to
fulfill the contract by cutting pine trees in
southeastern Montana and floating them
down the Little Missouri to the railroad
crossing, a distance of about 270 miles.

Bly cut ties in the summer of 1880 and
by July or August had some in the River,
but the River was too low to move them
downstream. No ties were delivered in
1880. In 1881, the ties also were not deliv-
ered, possibly because of an Indian scare.
On June 16, 1882, the *Bismarck Tribune*
(*Tribune*) reported that "the ties are com-
ing down" and on July 14th that the "ties
were coming down all right." On August
11, 1882, the *Tribune* reported that Bly
was loading about 47,000 ties and that the
"second run is about 100 miles up, and will
not get down until next spring." The fol-
lowing spring, on May 25, 1883, the *Trib-
une* wrote that "all" Bly's ties had arrived.

The district court found that Eber Bly
had so much trouble transporting the ties
on the River in 1880 and 1881 that he had
to resort to hauling ties overland. 770
F.Supp. at 509–10. Having entered into a
contract to float ties down the River and
having no success for two years, Bly evi-
dently decided it was easier to haul eight-
foot railroad ties 100 miles overland, than
float them down the Little Missouri. The
district court found that even after drag-
ging the ties overland to an area closer to
Medora, the ties only made it down that
section of the River with the benefit of
high waters. *Id.* at 510. In June 1882 the
*Tribune* reported that the chances were
good that the ties would reach the crossing

---

**6.** A tie drive is a means of transporting logs
from one location to another by floating them
down a river.

because the "stream is very high at present and still booming." In May 1883 the *Tribune* wrote that the last of the ties had arrived and the River "was higher yesterday at the crossing of the North Pacific than it has ever been known before." The Supreme Court has stated: "The mere fact that logs, poles and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river." *United States v. Rio Grande Dam & Irrigation Co.*, 174 U.S. 690, 698, 19 S.Ct. 770, 773, 43 L.Ed. 1136 (1899). Thus, even though the ties did ultimately travel down the River, because they floated in times of high water, the tie drive does not prove the legal navigability of the River.

The *Tribune* also reported in May 1883 that Bly's contract with the Missouri Pacific Railroad had "been a losing one" for Bly. The State presented no historical evidence of any other similar attempts at commercial uses of the Little Missouri after Bly's undertaking. The district court concluded that Bly's failed efforts to conduct a tie drive supported the contention of the United States that the Little Missouri was not a highway of useful commerce at the time of statehood. 770 F.Supp. at 510. The district court held that the tie drive did not rise to the level of "occasional" usage, rather it was a unique and isolated venture. *Id.* at 510. There is ample evidence to support the finding of the district court that the Bly tie drive was an isolated venture that was only partially successful because of unusually high water.

### B. *Use by the Mandan and Hidatsa Indian Tribes*

The State also presented historical evidence of Indian use of the River in the 1700s to demonstrate the River's navigability at statehood. The State relied on the written works of Dr. Alfred Bowers, an anthropologist who studied the Mandan and Hidatsa Indian tribes in the 1940s. According to Dr. Bowers' book, *A History of the Mandan and Hidatsa*, the Mandan and Hidatsa travelled on the Little Missouri River in bullboats. Bullboats were typically saucer-shaped craft, constructed of willow branch frames to which animal skins are attached. The boat was designed for the shallow rivers of the northern plains and needed as little as four inches of water upon which to travel. According to Dr. Bowers, in the 1700s Mandan and Hidatsa hunting parties would travel in late summer or fall to their winter camps along the Little Missouri. In the spring they would return on the River, floating their lodge equipment, surplus meat, and hides in bullboats.

The district court found that although other individuals who had contact with the Mandan and Hidatsa tribes in the 18th and 19th centuries had documented use of bullboats on neighboring rivers, only Dr. Bowers mentioned bullboat use on the Little Missouri River. 770 F.Supp. at 511–12. Because Dr. Bowers was the only expert to mention this use of the River, the district court concluded that the evidence was entitled to little weight. Furthermore, the district court found that even if this evidence were undisputed, it does not support a finding of navigability, because it does not prove that the River was used as a highway for useful commerce. *Id.* at 512.

### C. *Ferries on the River*

At trial, North Dakota established the existence of cable ferries on the River at Watford City and Marmath, North Dakota, in the early 1900s. These ferries were attached to cables strung across the River from two relatively high points, towers, or posts. The ferries functioned much like bridges where funds were not available to construct traditional bridges. The ferries were used only to provide transportation across the River; they were not used for transportation up or down the River. The district court found the ferry service irrelevant to the issue of navigability because the fact that a cable ferry could cross at one point did not show the susceptibility of the River for upstream or downstream commercial use. *Id.* at 511.

### D. *Lewis and Clark Journals*

The State presented evidence that, in 1804–1805, Lewis and Clark wintered with

Indians living on the Missouri River, not far south from the mouth of the Little Missouri. During the winter, Meriwether Lewis gathered information about the area's rivers from the Indians and recorded the information in a journal, which the State introduced into evidence. In the spring of 1805 Lewis wrote in his journal that although the Little Missouri River's navigation was extremely difficult, "it may however be navigated with small canoes a considerable distance."

The district court indicated that the basis for Lewis' observation is unknown and his observation was made in the spring during a time of high water. Moreover, on a different occasion Lewis wrote that the River was not navigable based upon the account of Baptiste LePage, an explorer, who had journeyed forty-five days down the River in a "canoe" and had concluded that the River was not navigable. Thus, the district court found the Lewis and Clark journals to be inconclusive. *Id.* at 512.

### E. *Modern Day Canoe Use*

The State presented evidence of modern day recreational canoe use on some portions of the Little Missouri to demonstrate the River's susceptibility to commerce at statehood. According to the State's evidence, the draft of canoes is similar to that of watercraft historically used on waterways for commerce. The State contended that if canoes can travel the River today, commercial watercraft could have done so in the late 1880s. The State also introduced into evidence a study that examined riverflow gauge readings at either Marmarth or Watford, North Dakota, on the days that selected canoe trips occurred to prove that because there was canoeing, the River was "boatable" at the indicated flow readings.

The United States presented evidence at trial that the River today is not the same for purposes of useful commerce as it was at statehood. John Bluemle, a geologist with the North Dakota Geological Survey, testified that the "channel of flowing water may shift in its course from day-to-day

within the riverbed." Bluemle found that the "pattern of creation and destruction takes place from day to day and from week to week" and even from "hour to hour." The district court found that modern day canoe use and modern day "boatability" data are not reliable indicators of the River's navigability at statehood. *Id.* at 512.

### III. CONCLUSION

We have carefully reviewed the record and conclude that the record supports the district court's rejection of the Bly tie drive, the use of the bullboats, the river ferries, the Lewis and Clark journals, and the modern canoe use as evidence that the River was navigable at the time of statehood. We hold that the district court's ultimate finding that the Little Missouri River was not navigable at the time of North Dakota's statehood is not clearly erroneous.

Accordingly, we affirm the district court's order holding that the United States has title to the riverbed.